STEVEN ET AL., RESPONDENTS, *v.* POTLATCH OIL & RE-
FINING CO. ET AL., APPELLANTS.

(No. 6,152.)

(Submitted September 22, 1927.   Decided October 13, 1927.)

[260 Pac. 119.]

*Oil and Gas Leases—Forfeiture—Failure to Release of Record
—Premature Demand for Release—Construction of Contract
—Statute Remedial in Character—Time for Making Demand
for Release of Record.*

Oil and Gas Lease—Forfeiture—Time for Making Demand for Release
of Record.
1.   Section 6902, Revised Codes 1921, provides that when an oil
and gas lease shall become forfeited it is the duty of the lessee
to record the release thereof within sixty days from the date of
forfeiture; section 6904 provides that the lessor must at least
twenty days before bringing the action given him by section
6903 to enforce release demand such release of record. *Held,*
that after forfeiture the lessor is not required to wait sixty
days before making demand but may do so at any time, provided
suit is not commenced before the expiration of the sixty-day
period during which it is the duty of the lessee to make release.

Same—"Forfeiture"—Meaning of Term.
2.   The word "forfeiture" as used in the statute making it
the duty of the lessee of oil and gas lands to cause the lease to
be released of record within sixty days after forfeiture (secs.
6902–6904, Rev. Codes 1921) means the deprivation of the right
of the lessee to further remain in the possession under the lease
in consequence of a nonperformance of an obligation or condition
resting upon him thereunder.

Same—Statute Remedial in Character—Construction.
3.   *Held,* that the above statute, being remedial in character, must
receive such a construction as that, when practically applied,
it will tend to afford the remedy which the legislature sought to
afford, and that as so construed, the contention of defendant
lessee that the statute has reference only to cases of strict
forfeitures and not to termination of the lease as therein provided
cannot be sustained.

Appeal—Failure to Move for New Trial—Extent of Review of Evi-
dence.
4.   In a cause, tried to a jury, in which no motion for a new
trial was made, the review of the evidence by the supreme court
under assignments that error was committed in not granting
defendant's motion for nonsuit and that the evidence does not
sustain the verdict is limited to an examination of the record to
determine whether there is any substantial evidence to support the
verdict or judgment.

Oil and Gas Lease—Length of Term—Construction of Contract.
5.   An oil and gas lease provided that the lessee should have
the oil and gas under the land leased for five years, "and as
much longer as oil and gas, or either of them, shall be produced"

therefrom by the lessee, on payment of a certain royalty; it further provided that royalty should be paid on oil produced in paying quantities and gas produced in marketable quantities and that if gas was produced but there was no profitable market for it, the well should be plugged and no royalty should be due. Within the five-year period the lessee drilled a well which, though not producing oil, did produce gas in marketable quantities but on account of other larger wells in the field found no market therefor. The lessor contended that under the provisions of the lease the lessee was not only required to show production of gas in marketable quantities but was required to actually market it, else the lease became forfeited at the end of five years. *Held*, that such a construction of the lease would violate the spirit as well as .the letter of the contract and would be tantamount to saying that while a well was drilled producing gas in marketable quantities it was not producing because there was no market for the gas; *held*, further, that gas in marketable quantities having been found within the five-year period the lease continued in force as much longer as gas was being so produced, and the lessor's demand upon the lessee to release the lease of record as forfeited was premature.

Same—Premature Demand for Release of Record—Lessor may not Complain of Noncontinuance of Operations After Such Demand.
6. Where a lessor of oil and gas lands prematurely demands of his lessee that he release the lease of record as forfeited, he is not in a position to complain that thereafter the lessee did not continue exploration.

[1]   Mines and Minerals, 40 **C. J.**, sec. 707, p. 1086, n. 2, 3, p. 1087, n. 4.
[2, 3]   Fines, Forfeitures and Penalties, 25 **C. J.**, sec. 43, p. 1170, n. 6.  Forfeit, 26 **C. J.**, sec. 4, p. 892, n. 68.  Mines and Minerals, 40 **C. J.**, sec. 704, p. 1084, n. 71; sec. 707, p. 1086, n. 99, 1, p. 1087, n. 4.   Statutes, 36 **Cyc.**, p. 1185, n. 48.
[4]   Appeal and Error, 3 **C. J.**, sec. 907, p. 987, n. 38.
[5]   Contracts, 13 **C. J.**, sec. 486, p. 525, n. 41, p. 527, n. 43, 46. Mines and Minerals, 40 **C. J.**, sec. 666, p. 1052, n. 3; sec. 670, p. 1055, n. 42; sec. 696, p. 1079, n. 84, 86 New; sec. 707, p. 1087, n. 4.
[6]   Mines and Minerals, 40 **C. J.**, sec. 696, p. 1079, n. 88.

*Appeal from District Court, Toole County; John J. Greene, Judge.*

ACTION by William H. and Lavina Steven against the Potlatch Oil & Refining Company and another. From a judgment for plaintiffs, defendants appeal. Reversed and remanded, with direction to dismiss the action.

*Messrs. Harris & Hoyt,* for Appellants, submitted an original and a reply brief; *Mr. G. G. Harris* argued the cause orally.

Under the pleadings it appears that unless oil or gas were discovered within the five-year period the lease had expired by

its own limitations and therefore had not become forfeited, and the demurrer to the complaint should have been sustained because the complaint does not state a cause of action. The statute (secs. 6902–6904, Rev. Codes 1921), does not in express terms make it applicable in a case where the lease has expired in accordance with the agreement between the parties at the time the contract was entered into, and since nothing will be read into a penal statute such as this, the question to be decided is whether the word "forfeiture" embraces also expiration of contract by express agreement of the parties. We submit that it does not. (Black's Law Dictionary, 512; 26 C. J. 892; 2 Words and Phrases, 611.) Where the term of a lease has expired in accordance with the express agreement of the parties, it does not involve a "forfeiture" within any reasonable definition or interpretation of the meaning of the word or the meaning of the phrase "become forfeited" used in the statute. (*Ash Grove Lime & Portland C. Co.* v. *Chanute B. & T. Co.*, 100 Kan. 547, 164 Pac. 1087; *Curtis* v. *Harris*, 76 Okl. 226, 184 Pac. 574; *Kahm, etc.*, v. *Arkansas River Gas Co.*, 122 Kan. 786, 253 Pac. 563; *Chaney* v. *Ohio & I. Oil Co.*, 32 Ind. App. 193, 69 N. E. 477; *Brown* v. *Fowler*, 65 Ohio, 507, 63 N. E. 76; 1 Thornton, Oil and Gas, 4th ed., p. 425.)

Under the terms of the lease, the lessee was not obliged to produce oil or gas in paying quantities in order to continue the lease in force subsequent to the expiration of the five-year term. The particular provision of the lease is as follows: "To have and to hold the same for the term of five years from this date, and as much longer as Oil and Gas, or either of them shall be produced from said land by the lessee." (1 Thornton, Oil and Gas, 4th ed., 430; *Southern Penn Oil Co.* v. *Snodgrass*, 71 W. Va. 438, 43 L. R. A. (n. s.) 848, 76 S. E. 961; *Shannon* v. *Long*, 180 Ala. 128, 60 South. 273; *McGraw Oil & Gas Co.* v. *Kennedy*, 65 W. Va. 595, 28 L. R. A. (n. s.) 959, 64 S. E. 1027.) To hold that in the present case, the appellants were required to produce gas or oil in paying quantities before the expiration of the lease is to read into the instrument some-

thing that is not there, but, on the contrary, the lease merely calls for production within the time, and the only charge made by the respondents in their complaint is that we failed to produce, nothing whatever being said about paying or commercial quantities. The appellants further contend that the production of a half million feet of gas is production in paying quantities. The evidence of the respondents showed that five days after the time when the five-year period mentioned in the lease would expire, the well drilled upon the land by the appellants was making this amount of gas, which was sufficient to supply the average daily needs of a town the size of Shelby.

Furthermore, it is a question to be left to the determination of the lessee as to whether production in paying quantities has been obtained. (*Manhattan Oil Co.* v. *Carroll,* 164 Ind. 526, 73 N. E. 1086; *Barbour Stedman & Co.* v. *Tompkins,* 181 W. Va. 116, 93 S. E. 1038; *Lowther Oil Co.* v. *Miller etc. Oil Co.,* 53 W. Va. 501, 97 Am. St. Rep. 1027, 44 S. E. 433; *Summerville* v. *Apollo Gas Co.,* 207 Pa. 334, 56 Atl. 876; *Young* v. *Forest Oil Co.,* 194 Pa. 243, 45 Atl. 121; *Osburn* v. *Finkelstein,* 189 Ind. 90, 126 N. E. 11; *Texas Pacific Coal & Oil Co.* v. *Bratton* (Tex.), 239 S. W. 691.)

The court erred in refusing to give the following instruction: "If you find that gas was produced but was shut in on account of a lack of market, and that such production was obtained by the defendants, or either of them, prior to the seventeenth day of April, 1926, you are instructed that gas was produced from the land within the meaning of the terms of the lease and your verdict shall be for the defendants." In the lease the parties expressly agreed that the lessee instead of paying an annual cash rental to the lessors would pay them a certain share of the gas, and the contract between the parties was to this effect, and it was mutually agreed that it would not be necessary to pay this percentage when the well was "shut in" on account of a lack of market. This was a contractual matter between them, and if the lessors had a preference for a percent-

age of the gas to be paid when there was a market for it over a stipulated cash rental or royalty, they cannot now come into court and be heard to complain because, due to a lack of market, they are getting no returns from the lease; under the terms of the contract it was agreed that they should not, and there is no reason why any distinction should be made in construing the contract between a lease of this kind and one where an annual or periodic cash rental is provided for. In both cases the contract is being fulfilled and what is to be deemed gas in paying quantities under the terms of one lease should also constitute paying quantities under the other, even though a different form of return and remuneration has been reserved to the lessors. (*Pryor Mountain Oil & Gas Co.* v. *Cross,* 31 Wyo. 9, 222 Pac. 570.)

*Mr. Louis P. Donovan,* for Respondents, submitted a brief and argued the cause orally.

Appellants' argument that the complaint does not show a cause of action under sections 6902–6904 is based upon the claim that the facts alleged do not show that the lease became "forfeited." Respondents submit that the facts alleged show that there was a forfeiture even within the strict definition of that term. Whether or not the lessee had a vested estate in the lands beyond the fixed term, prior to discovery of oil or gas, he certainly had the exclusive right and privilege of obtaining such interest after the fixed term by performing the conditions prescribed. The loss of that exclusive right and privilege to continue the lease in force after the fixed term is the loss of a substantial property right, and is, therefore, forfeiture.

Since the right to continue the lease in force after the fixed term was lost by failure to produce oil or gas, the case was one of forfeiture within the strict definition of that term, notwithstanding the fact that the title to the estate to be conveyed by the "thereafter" clause would not actually vest until the condition precedent was performed. The only courts

that have passed upon this question have so held. (*Caylor* v. *Bankers Oil Co.,* 110 Kan. 224, 203 Pac. 735; *Jewett* v. *Coffeyville Vit. Brick & Tile Co.,* 122 Kan. 287, 251 Pac. 1110; *Hyde* v. *Blaxter,* 299 Fed. 167; *Bundy* v. *Ahrens,* 115 Kan. 818, 224 Pac. 899; *Caldwell* v. *Alton Oil Co.,* 161 La. 139, 108 South. 314, 7 O. & G. L. S. 390.)

Respondents .therefore submit that the termination of the lessee's right to continue in possession of the premises and to operate the same is a "forfeiture" within the "ordinary and popular" meaning of that term. "The words of the contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning." (Sec. 7535, Rev. Codes 1921.) But any doubt as to whether the present case is within the statute should be resolved in favor of sustaining the action, because the statute is remedial and should be liberally construed to effect its object. (*Farmers & Merchants' Nat. Bank* v. *Dearing,* 91 U. S. 29, 23 L. Ed. 196 [see, also, Rose's U. S. Notes].) By the express terms of the lease, it continues in effect after April 16, 1926, only "as much longer as oil and gas, or either of them, shall be produced from the said land by the lessee." (*Kahm* v. *Arkansas River Gas Co.,* 122 Kan. 786, 253 Pac. 563; *Caylor* v. *Bankers Oil Co.,* 110 Kan. 224, 203 Pac. 735; *White* v. *Green River Gas Co.* (C. C. A.), 8 Fed. (2d) 261; *Tedrow* v. *Shaffer* (Ohio C. A.), 155 N. E. 510; *Anderson* v. *Schaffner,* 9 W. Va. 225, 110 S. E. 566; *Cassell* v. *Crothers,* 193 Pa. 359, 44 Atl. 446, 20 Morr. Min. Rep. 160; *Murdock-West Co.* v. *Logan,* 69 Ohio St. 514, 69 N. E. 984.) To continue the lease in force after April 16, 1926, the production of gas had to be in paying quantities. In the lease the parties made provision for the payment of royalty "for the gas at each well which shall  *  *  *  produce gas in marketable quantities." This provision negatives any intention to pay royalty for gas which is not produced "in marketable quantities." The purpose of the lessor in the giving of an oil and gas lease is to obtain the royalties reserved to him. (*Gypsy Oil Co.* v. *Marsh,* 121 Okl. 135, 48

A. L. R. 876, 248 Pac. 329; *Caldwell* v. *Alton Oil Co.,* 161 La. 139, 108 South. 314, 7 O. & G. L. S. 390; *White* v. *Green River Gas Co.* (C. C. A.), 8 Fed. (2d) 261.)   Since the intent of the lessor in the giving of the lease was to obtain the royalties reserved to him, it is entirely unreasonable to suppose that the parties intended the lease would nevertheless be continued in force and effect by the production of gas in quantities from which the lessor could derive no royalty whatsoever or while the well was "shut in."   Even in the absence of statutory provision limiting the "thereafter" term, or provision in the lease exempting the lessee from the payment of royalty upon gas produced in nonmarketable quantities, the courts generally have held that a lease can be continued in force and effect after the fixed term only by production of oil or gas in paying quantities if the royalty consists of a part of the mineral produced.   (*Gypsy Oil Co.* v. *Marsh,* 121 Okl. 135, 48 A. L. R. 876, 248 Pac. 329; *Scott* v. *Price,* 123 Okl. 172, 247 Pac. 103; *Pine* v. *Webster,* 118 Okl. 12, 246 Pac. 429; *Anderson* v. *Schaffner,* 9 W. Va. 225, 110 S. E. 566; *South Penn Oil Co.* v. *Snodgrass,* 71 W. Va. 438, 43 L. R. A. (n. s.) 848, 76 S. E. 961; *Caldwell* v. *Alton Oil Co.,* 161 La. 139, 108 South. 314, 7 O. & G. L. S. 390; *Bundy* v. *Ahrens,* 115 Kan. 818, 224 Pac. 899; *Elliott* v. *Crystal Springs Oil Co.,* 106 Kan. 248, 187 Pac. 692; *White* v. *Green River Gas Co.* (C. C. A.), 8 Fed. (2d) 261; *Murdock-West Co.* v. *Logan,* 69 Ohio St. 514, 69 N. E. 984; *Cassel* v. *Crothers,* 193 Pa. 359, 20 Morr. Min. Rep. 160, 44 Atl. 446.)

The evidence is ample to show that the gas well drilled by appellants, was not producing gas in marketable quantities under existing conditions in the Kevin-Sunburst field, and that there is no prospect of any conditions developing that will create a market for a gas well producing so small a quantity of gas at so low a rock pressure.   Furthermore, mere capacity to produce gas in commercial quantity is not sufficient.   The gas must be actually produced and marketed.   This is the plain and explicit language of the lease.   It continues in effect until

April 16, 1926 "and as much longer as oil or gas, or either of them, shall be produced from said land by the lessee." If it was the intention of the parties that the lease should continue in force so long as there existed upon the premises a gas or oil well, which was capable of producing oil or gas in commercial · quantities, the parties doubtless could and would have expressed that intention in clear and certain language. But a well that is merely capable of production, but from which the lessee does not produce or market its production, would pay the lessor no royalty. So far as the lessor is concerned, there is no difference in result between a well that is absolutely dry and one in which oil or gas may be found in substantial quantities, but which is not being produced. In order to insure the lessor any return, it is necessary that the lease should produce, and therefore the provision for the continuation of the lease is, that it shall continue "as much longer as oil or gas is produced." It would seem to follow from the plain and explicit language of the lease that if the lessee fails to produce oil or gas subsequent to the expiration of the fixed term, the lease will at once terminate. If there is uncertainty as to the continuation of the lease in the event of failure to produce, such uncertainty must be resolved in favor of the lessor and against the lessee. (*Daley* v. *Torrey,* 69 Mont. 599, 223 Pac. 498; *Solberg* v. *Sunburst Oil & Gas Co.,* 76 Mont. 254, 246 Pac. 168; *Bowes* v. *Republic Oil Co.,* 78 Mont. 134, 252 Pac. 800.)

In cases of this character, where the lease provides that the royalty consists of a fractional part of the product, the authorities hold that the lessee must not only discover the mineral upon the land within the fixed term, but he must thereafter actually produce and market the same, in order to keep the lease in force and effect after the expiration of the fixed term (*Elliott* v. *Crystal Springs Oil Co.,* 106 Kan. 248, 187 Pac. 692; *White* v. *Green River Gas Co.,* 8 Fed. (2d) 261; *Gypsy Oil Co.* v. *Marsh,* 121 Okl. 135, 48 A. L. R. 876, 248 Pac. 329; *Bundy* v. *Ahrens,* 115 Kan. 818, 224 Pac. 899; *Caldwell* v.

*Alton Oil Co.,* 161 La. 139, 108 South. 314; 7 O. & G. L. S. 390;
*Tedrow* v. *Shaffer* (Ohio Civ. App.), 155 N. E. 510; *Anderson*
v. *Schaffner,* 9 W. Va. 225, 110 S. E. 566; *Cassell* v. *Crothers,*
193 Pa. 359, 20 Morr. Min. Rep. 160, 44 Atl. 446; *Pine* v.
*Webster,* 118 Okl. 12, 246 Pac. 429; *Scott* v. *Price,* 123 Okl.
172, 247 Pac. 106.)

MR. CHIEF JUSTICE CALLAWAY delivered the opinion
of the court.

The plaintiffs are the owners of 320 acres of land in Toole
county.   On April 16, 1921, they executed to Troy-Sweet Grass
Oil Syndicate a lease whereby they granted all the oil and gas
in and under the land for the term of five years from that
date "and as much longer as oil and gas, or either of them,
shall be produced from said land by the lessee." The lease
contained this provision: "The lessee agrees to yield and pay to
the lessor the one-8th part or share of the oil which he may
obtain and save from said land, which share shall be delivered
to the lessor from the lessee's tanks at the wells, or for the
lessor's credit to such Pipe Line Company as may connect its
lines with said tanks, and to pay for the gas at each well which
shall not produce oil in paying quantities, but produce gas in
marketable quantities, a royalty of one-8th per year for each
well so produced, except that during the time any such gas
shall be 'shut in' by reason of there being no profitable market
for its output, there shall be no royalty."

It was provided that, if no well should be commenced on the
land within two years from the date of the lease, the lease
should become null and void unless the lessee should pay to the
lessors for further delay a rental of fifty cents per acre in
advance for each additional year until a well should be com-
menced on the land.   The royalties, delay rentals  and other
payments which might fall due under the lease were to be
paid to the lessors, or to their credit in the First State Bank of
Shelby, which was constituted the agent of the lessors, with
power to receive and receipt for the same.   Upon failure of the

lessee to make any of the payments provided for delay in commencing the well on the date when the payment should become due, the lessors were given the right to declare a forfeiture of the lease if the payment be not made within ten days after written notice to pay the same.

About August 18, 1923, the defendant, Potlatch Oil & Refining Company, succeeded to the rights of the Troy-Sweet Grass Oil Syndicate in the lease, and on April 14, 1926, H. G. Hungerford, as trustee, succeeded to the rights of the Potlatch Oil and Refining Company in the lease to the extent of eighty per cent of the oil, gas and other mineral in one-half of the land. On May 31, 1926, the plaintiffs, asserting that the defendants had not complied with the requirements of the lease, and that the same was forfeited and terminated, demanded of them in writing that the oil and gas lease be released of record, and on July 30th commenced an action against the defendants, alleging in the complaint that the defendants had failed to produce oil or gas, or either of them, from the land within five years from the date of the lease, or thereafter, and that the lease became forfeited and terminated on April 16, 1926. Plaintiffs prayed judgment for the sum of $8,000 damages and $100 provided by statute as a penalty, and that the lease be declared forfeited and released of record in addition to the damages.

Upon the overruling of their demurrer to the complaint the defendants answered. They alleged that prior to the expiration of the five years' period during which the lease was to run, and on the eighth day of April, 1926, they encountered gas in paying and commercial quantities, to wit, a flow of approximately 456,000 feet per day, and ever since that date had produced gas from the land and had paid to the lessors the royalty required under the terms of the lease; that ever since April 8, 1926, the well had produced gas in marketable quantities and had been "shut in" a large part of the time since production was obtained by reason of there being no profitable market for its output. They alleged that

they had in all respects complied with the lease. These allegations were denied by the reply.

The case was tried to a jury, which found a verdict for the plaintiffs in the sum of $4,900, upon which the court entered judgment, from which the defendants have appealed.

1. The defendants urge here, as they did at various times [1] during the proceedings in the trial court, that the complaint does not state facts sufficient to constitute a cause of action, for the reason that it shows upon its face that the action was brought prematurely. It is said that the defendants, after forfeiture, are given sixty days by the terms of the statute in which to record their release, and that as the statute provides that before commencing an action a lessor must give twenty days' notice to the lessee, eighty days must elapse before an action may be commenced. In this instance the plaintiffs, asserting that the lease had expired on April 9, 1926, gave their notice on the 31st of May, 1926.

Section 6902, Rev. Codes 1921, provides in effect that when any oil, gas or other mineral lease shall become forfeited it shall be the duty of the lessee, his successors or assigns, within sixty days from the date of the forfeiture, to have the lease released from record in the county where the leased land is situated, without cost to the owner. Section 6903 provides that if the owner of the lease neglects or refuses to execute a release the owner of the leased premises may sue in any court of competent jurisdiction to obtain the release, and may in the action recover of the lessee, his successors or assigns, the sum of $100 as damages, and costs, and any additional damages that the evidence in the case may warrant. The next section, 6904, provides that at least twenty days before bringing the action the owner of the leased premises shall demand of the holder of the lease, if he can be found in the state, that the lease be released of record.

Thus, we see that by the provisions of section 6902 it is the duty of the lessee, and without any action on part of the lessor, to record the release within sixty days from the

date of the forfeiture. There is nothing in any of the three sections above referred to indicating that the lessor must wait until the expiration of the sixty days, before demanding the cancellation of the lease. It is simply provided that before bringing action against the lessee, he must demand that the lessee place the release of record. No good reason appears why the lessor after forfeiture, may not make the demand whenever he sees fit, provided he does not begin the suit before the expiration of the sixty days during which period it is the duty of the lessee to make the release.

The defendants also claim that the statute applies in cases [2, 3] of forfeiture only and does not apply to the termination of a lease in virtue of its terms, and in support of their position present argument and cite authorities, though none directly in point.

The word ''forfeit'' has a number of meanings, or shades of meaning. It may mean to alienate the right to possess by some neglect. (Webster's International Dictionary.) Forfeiture is a deprivation or destruction of a right in consequence of a nonperformance of some obligation or condition. (*Webster* v. *Dwelling House Ins. Co.*, 53 Ohio St. 558, 53 Am. St. Rep. 658, 30 L. R. A. 719, 42 N. E. 546, quoted in Words & Phrases, 2893.) Forfeiture is where a person loses some property, right, privilege or benefit in consequence of having done or omitted to do a certain act. (1 Rapalje & Lawrence's Law Dictionary, 535; *State* v. *DeGress*, 72 Tex. 245, 11 S. W. 1029.) To forfeit is to divest or to suffer divestiture of property without compensation in consequence of a default or offense. (Anderson's Law Dictionary.)

These definitions, we think, indicate the meaning which the legislature intended in using the words ''forfeited'' and ''forfeiture'' in the statutes above referred to. The statute is remedial in character. (*Solberg* v. *Sunburst Oil & Gas Co.*, 73 Mont. 94, 235 Pac. 761; Id., 76 Mont. 254, 246 Pac. 168.) Even if the statute is of a penal nature, and may not be extended by construction, it should receive such a construction

as, when practically applied, will tend to afford the remedy which the legislature sought to apply. (*State* v. *Livingston C. B. & M. Co.*, 34 Mont. 570, 9 Ann. Cas. 204, 87 Pac. 980.) The period of the lease is for five years and as much longer as oil and gas, or either of them, shall be produced from the land by the lessee. If the lessee, or its successors, had drilled a well which produced oil in paying quantities or gas in marketable quantities on April 16, 1926, the lease would continue in full force so long as the well continued thus to produce. If the lessee or its successors had not drilled a well which was producing oil in paying quantities, or gas in marketable quantities, on April 16, 1926, the lease, an "unless" lease, came to an end, and the right of the lessee and its successors to remain in possession of the land or to explore it for oil or gas was forfeited. The lessee by neglecting to avail itself of its privileges had alienated its right to continue its lease. By reason of omitting to do the act which entitled it to enjoy the lease—its failure to drill a well producing oil or gas—the lessee's privilege was gone. The forfeiture clause, as we said in *McDaniel* v. *Hager-Stevenson Oil Co.*, 75 Mont. 356, 243 Pac. 582, is for the benefit of the lessor. In that case the lessor, correctly, deemed it unnecessary to require the lessee to cancel the lease of record. The lessor may waive the right if he sees fit to do so. The statute does not require him to insist upon it. But in the instant case the lessee, after demand, refused to execute the release and place it of record, from which the lessors were warranted in thinking the lessee still claimed the lease to be in force. The lease was of record, and the end of its term was not ascertainable from its face, for the reason that its termination or forfeiture depended upon what the lessee might or might not do or have done. (*Caylor* v. *Bankers Oil Co.*, 110 Kan. 224, 203 Pac. 735.) The lease, uncanceled upon the record, was a cloud upon the title, which the lessors desired to remove and if the lease had come to an end it was their right to have the lessee cancel it of record. The complaint states a cause of action.

2. Many errors are assigned but the case is determinable [4] upon the assignments of error which are to the effect that the court erred in not granting defendants' motion for a nonsuit, and that the evidence does not sustain the verdict. As there was not a motion for a new trial the review of the evidence by this court is limited to an examination of the record to determine whether there is any substantial evidence to support the verdict, or judgment. (*Watts* v. *Billings Bench Water Assn.*, 78 Mont. 199, 253 Pac. 260; *La Bonte* v. *Mutual Fire & Lightning Ins. Co.*, 75 Mont. 1, 241 Pac. 631; *State* v. *Brantingham*, 66 Mont. 1, 212 Pac. 499.)

Counsel for plaintiffs insisted that in order to maintain [5] their lease the defendants must have produced gas in "paying quantities," citing many authorities. But their main reliance is based upon their assertion that to continue the lease in force after April 16, 1926, "the production must be in marketable quantities, and must be actually marketed," relying on *Kahm* v. *Arkansas River Gas Co.*, 122 Kan. 786, 253 Pac. 563, and cases therein cited. They argue also that the marketing clause in the lease has only to do with the payment of royalty and does not relate to the habendum clause. On the other hand counsel for defendants rely upon 1 Thornton on Oil & Gas, 4th ed., 430, wherein it is said: "If a lease is to continue so long as oil or gas is produced, then it is immaterial whether the lease is a paying one or not; for so long as the wells drilled produce either oil or gas the lease continues. The lessor cannot complain of his own folly in granting such a lease. This is especially so if the lessee made and is making a faithful effort to make the well sunk productive." They also say that the question as to whether the well is producing in paying quantities is to be determined by the lessee acting in good faith and upon honest judgment, citing *Manhattan Oil Co.* v. *Carroll*, 164 Ind. 526, 73 N. E. 1084, and other authorities. As to marketing the gas, the defendants rely upon the terms of the lease itself.

Into some of these divergent theories we shall not go.   We have examined the authorities cited by respective counsel and many others, but as we view the situation a discussion of the holdings of the various courts would prove without profit in the decision of this case.

The parties made a contract for themselves and must stand or fall by its terms.   The land was in what oil operators term a wildcat field.   The lessors had much to gain and little to lose in granting the lease.   They exacted a payment of $160 as an initial consideration for the lease, and after two years, if a well was not commenced on the land, $160 in advance until a well should be commenced.   If the lessee should be successful its success would mean success for the lessors.   The lessors would receive a royalty on the oil and gas produced.   The lessee was about to enter upon an uncertain and expensive undertaking, speculative in character, which might result in heavy loss. Under these circumstances an exploratory period of five years, but with substantial payments exacted by the lessors, was agreed upon; it was also agreed, in the event that oil or gas were produced within the exploration period the lessee should have a longer term—"as much longer as oil or gas, or either of them, shall be produced from said land."   Two phrases were used with respect to the royalty; royalty should be paid on oil produced in "paying quantities," and upon gas produced in "marketable quantities."   The lease must be read as a whole; each and every part of it must, if possible, be given effect; one portion must be used to explain another in order to bring harmony to the whole.   By construing the instrument with these guides in mind we ascertain the meaning of the word "produced" in the habendum clause.   It means oil produced in paying quantities and gas produced in marketable quantities.

The parties contemplated that there might not be any market for gas immediately, and provided "that during the time any such gas shall be 'shut in' by reason of there being no profitable market for its output, there shall be no royalty."   They contemplated the possibility of a well capable of producing

gas in marketable quantities and the possibility that there would be no market for it. They provided, in effect, therefore, that the gas should not be permitted to waste, but that it should be confined in the well, "shut in." Bear in mind that on April 16, 1921, this was a wildcat field. Their foresight was good. Five years later Shelby, the principal town in the Kevin field, which embraces the leased land, eighteen miles distant from the well, was consuming only between 400,000 and 500,000 cubic feet of gas daily. It would require millions, said a witness, to conduct gas to Great Falls, 100 miles distant, and a pipe-line to that city was not yet begun. The wells in the Kevin field at the time of the trial were producing (or capable of producing) ten times the amount of gas for which there was a market.

Assuming that the defendants had brought in a well capable of producing gas in marketable quantities; to say that they shall be declared in default and shall forfeit their lease if they do not market the product, when there is no profitable market within reach, would be contrary to the terms of the contract which the parties have made for themselves. Such a construction would violate the spirit if not the very letter of the contract. It would amount to saying, the defendants have drilled a producing well which furnishes gas in marketable quantities, but as there is no market the well is not producing. The contract is not reasonably susceptible to any such interpretation. The lessors will not be heard to complain of their own folly, if folly it was, in granting such a lease.

. The defendants began drilling on March 24, 1926, and on April 9, 1926, brought in a well which would produce 450,624 cubic feet in twenty-four hours. It would produce that amount on April 21, 1926. In the latter part of May or first part of June, 1926, it was producing 450,000 feet; it was producing that amount on the day the plaintiffs demanded that the lessees cancel the lease of record. And there is nothing to show that the well was not capable of producing that amount on the day the suit was filed. The plaintiffs were per-

mitted, over the objection of defendants, to introduce testimony to the effect that the well was producing but 10,000 a day in November, 1926, but no supplemental complaint was filed, and that testimony will not support the verdict. But, said the witness who gave the testimony, there appeared to be an obstruction in the well.

There was considerable testimony concerning the rock pressure, but no witness was able to state what the pressure was. A witness said, "By memory only, I think it was around twenty to twenty-five pounds." In November this same witness found the pressure to be thirty-three pounds when the well has been closed only thirty minutes. Rock pressure, said the witness, is the pressure taken on a well after it is closed in for twenty-four hours. After production of gas was encountered the defendants drew from the well the eight-inch casing and inserted instead a two-inch casing. According to a witness, it is a practice in that field to have a small casing put in a gas well with a packer around it. The packer is placed around the pipe to keep the dirt from going down and falling into the gas sand, and is sufficient to protect the well. This is just as satisfactory as leaving the gas in the well so far as protecting the gas is concerned.

The well was never connected with any gas-pipe line. It was developed that by reason of the low rock pressure gas from the well in question could not be conducted to market in a line carrying a higher pressure. Some other wells in the field have rock pressures varying from 370 to 650 pounds. In order to take gas from a well with a low pressure the pressure in the carrying line must be reduced. The gas might be pumped. Whether it is economical to pump, said a witness for plaintiffs, "is up to the man that puts money in it. A gas pumping plant is not expensive to install and not expensive to operate."

This well was capable of producing at its mouth approximately the amount of gas consumed daily in Shelby, eighteen miles away, but that market was being supplied by much superior wells. The well in question, by reason of its low rock

pressure, cannot without artificial aid be made available for use at Shelby. A witness for plaintiffs said that, assuming that the well has a rock pressure of twenty-five pounds it would deliver one-fifth of its production, 90,000 cubic feet, six miles distant. The market price of gas in the field, where there is a market, is five cents per thousand.

Evidence on part of the defendants tended to show that after gas was discovered in the well there was no cost of production. The gas from this particular well was worth $15 a day per boiler with which it was connected. It would run four or five, or possibly six, boilers. A boiler requires between forty and eighty thousand cubic feet of gas, a two-cycle internal combustion between eight and twelve thousand cubic feet, per day. The defendant Hungerford, an oil operator, used gas from the well from June 24 to July 8, 1926, including both days, for the purpose of running a boiler in connection with drilling operations upon land a mile or two distant from the well. He testified that he paid royalty in the sum of $28.12 to the credit of the plaintiffs at the First State Bank of Shelby; he credited the pipe-line which was laid from the well to ''Barger Number One,'' where the drilling was done, with $7.50 per day and the producing well with $7.50 per day.

From all the testimony, it seems that the well was capable of producing 450,000 cubic feet per day at all times from April 9, 1926, until the suit was commenced. If we regard the quantity of gas it must be admitted that the well produced, or was capable of producing, gas in marketable quantities. It must be admitted, too, that the well was shut in by reason of there being no profitable market for its output. It is not claimed that the defendants abandoned the well, or efforts to make the same profitable.

The plaintiffs moved with haste, and the reason is plain. Plaintiff William H. Steven in March, 1926, contemplating forfeiture of defendants' lease, gave one Farrish an option extending to April 17, 1926, for a lease on the land, being thereto induced by an offer of $4,000 in cash and a royalty of

[80 Mont. 239.]

fifteen per cent. Steven testified that there was a good market for an oil and gas lease upon his land between June 24, 1926, and July 4, 1926, and he could have got $20 an acre cash bonus for the lease.

Consequently he desired to rid himself of the defendants and their lease. Plaintiffs had received $160 cash consideration when the lease was executed. Presumably the rentals for the years 1924, 1925 and 1926 also had been paid. The defendants had drilled a well capable of producing 450,000 cubic feet of gas. Yet within two months of the bringing in of the well plaintiffs demanded cancellation of the lease, and brought suit within two months thereafter.

After giving the defendants the demand asserting the lease [6] had come to an end and that the defendants had no further rights in the premises, the plaintiffs will not be heard to complain that the defendants did not continue further exploitation.

Upon the facts the plaintiffs were not warranted in making the demand nor in commencing the action. Their vaulting ambition, like Macbeth's, o'erleaped itself.

The judgment is reversed and the cause is remanded to the district court, with direction to dismiss the action.

*Reversed.*

ASSOCIATE JUSTICES MYERS, STARK, MATTHEWS and GALEN concur.

Rehearing denied October 27, 1927.