JEAN THEODORE BRAUN, Plaintiff and Respondent, v. MON-O-CO OIL CORPORATION et al., Defendants and Appellants, FORREST DUFFIELD, Plaintiff and Respondent, v. MON-O-CO OIL CORPORATION, et al., Defendants and Appellants, GEORGE M. JENNER, Plaintiff and Respondent, v. MON-O-CO OIL CORPORATION, et al., Defendants and Appellants, JOHN LANG, Plaintiff and Respondent, v. MON-O-CO OIL CORPORATION, et al., Defendants and Appellants.

Nos. 9607 - 9610.
Submitted November 18, 1957. Decided January 22, 1958.
320 Pac. (2d) 366.

102

Brown, Sande & Forbes and Rockwood Brown, Jr., Billings, Young, Martin & Young, Baker, for appellants.

Charles Sande, Billings, argued orally for appellants.

Colgrove & Brown, Miles City, Gene Huntley, Baker, for respondents.

Gene Huntley, Baker, argued orally for respondents.

MR. JUSTICE CASTLES:

This is a consolidated appeal from judgments and decrees entered in four separate actions in which it was stipulated that all four actions will be controlled in their entirety by the decision in one case.

The case was tried before the court without a jury. Findings of fact and conclusions of law were made. The judgment and decree cancelled a certain oil and gas lease executed by the plaintiff, hereinafter called the lessor, to the defendant, Mon-O-Co Oil Corporation, hereinafter called the lessee. The judgment additionally cancelled certain assignments of royalty from the lessee to the other defendants. The matter of the cancellation or non-cancellation of the royalty interests mentioned naturally follows a determination of the lessee's rights.

On May 25, 1949, a lease was entered into for a monetary consideration of $1 on a mineral estate of 80 acres. In the same township where the lessor's land lay, and in the adjoining township, the lessee took leases from 21 landowners of approximately 6,000 acres.

The lease was for a term of five years and so long thereafter as oil or gas or either of them was produced and saved in commercial quantities from the leased properties.

The lease then provided "In Consideration of the Premises, the Lessee hereby covenants and agrees:

"(First:   To pay royalties)

"Second:   To have geological survey made of said leased lands, together with adjacent lands, which said survey is understood and considered as further and additional consideration for the giving of this lease.

"Third:   For the purpose of ascertaining the oil and gas possibilities of the above-described lands, and other lands in the vicinity thereof, to commence drilling operations upon such geologically surveyed lands within the limits of Township *Seven North* of Ranges *60 and 61 E* within *one year* from the date hereof, and to prosecute such drilling with reasonable diligence until said well is completed. Failure to commence and prosecute such drilling operations, as aforesaid, shall render this lease null and void.

"Fourth: It Is Expressly Agreed if drilling operations be not commenced on some portion of the lands covered by this lease within *one year* from and after the date of discovery of oil or gas in commercial quantities by the prospecting and test drilling to be carried out by the Lessee under the provisions of this lease,  *  *  *  this lease shall promptly terminate as to both parties, unless the Lessee, on or before expiration date of the time so provided, shall pay or tender to the Lessor, or to the Lessor's credit in *Bank of Baker* at *Baker, Montana,* or its successors, which shall continue as a depository for payment of rentals and royalties, regardless of change in the ownership of said lands, the sum of *fifty cents* per acre for the acreage total

stated above, which operate as a rental and cover the privileges of deferring the commencement of a well upon said leased land for one year from said date."

The lease continues with other provisions not of importance to this opinion.

Following the execution of the lease on May 25, 1949, on May 18, 1950, the lessee commenced drilling operations in the area by spudding in and setting seven inch surface casing to a depth of 289 feet. This particular phase of the drilling was completed in June 1950. On September 20, 1950, drilling was again commenced and the Judith River sand was reached and tested on or about October 20, 1950, at a depth of 1,367 feet. Thereafter, by about December 20, 1950, drilling was continued to a depth of about 1,500 feet at which time the drilling tools and 300 feet of drill pipe were lost in the hole. A fishing job for the tools was conducted and by July of 1952 a total depth of 2,011 feet was drilled when the hole was plugged and abandoned as a dry hole after the Eagle sand was tested.

On March 6, 1954, the lessor delivered to the lessee a notice that the lease had expired and terminated; this about 70 days prior to the 5 year term. On March 16, 1954, the lessor filed for record in the county clerk and recorder's office an affidavit of non-payment of rental under the lease. This affidavit was erroneous since under the terms of the lease, no payment was due.

On July 3, 1954, the lessor filed this action to cancel the lease. Other facts will be further set forth during the discussion of the points raised. The specifications of error resolve themselves into three issues as follows: (1) Was there any issue in the case concerning the duty of the lessee to have a geological survey made of the lands involved? (2) Was the drilling commitment complied with as to reasonable diligence, both as to time and depth? (3) If the lease was still in effect some 70 days prior to the expiration of the term, was the lessee excused from any further exploration and development by virtue of the act of the plaintiff in attempting to repudiate the lease?

As to the first question, the trial court specifically found that no geological survey, as mentioned in paragraph "Second" of the lease, was made prior to the commencement of the drilling operations by the lessee. The trial court wrote an opinion stating its reasoning. He considered the requirement of a geological survey as a condition precedent to the validity of the lease, and therefore stated that since there was no proof by the lessee that a geological survey had been performed, the lease became invalid. In part the trial court's opinion said: "Obviously, some of the conditions of the lease are uncertain. For example, the lease states that a geological survey shall be made of the lands and adjacent lands, and this is mentioned as one of the considerations for the execution of the lease. However, the type of survey is not specifically mentioned." The court then went on to reason that since the "Third" paragraph provided that drilling be commenced on such geologically surveyed lands, that even though the lease itself stated specifically in paragraph "Second" that, "which said survey is understood and considered as further and additional consideration for the giving of this lease," such a provision was in fact a condition precedent. The court used a rule of interpretation most strongly against the lessee and in favor of the lessor.

The complaint alleged that the lessee failed to commence, in good faith, drilling operations for the purpose of ascertaining oil and gas possibilities, and thereafter to prosecute such drilling with reasonable diligence until a well was completed as required by paragraph "Third" of the lease and that therefore the lease by its express terms became null and void. No pleading was made as to a failure of consideration with respect to paragraph "Second." Neither side made any contention during the course of the trial about whether or not a geological survey had been made. The only evidence adduced was upon questioning by the trial court as follows:

"The Court: As a matter of fact, you had on your contract here you were supposed to have a geological survey before you

went in there to drill, isn't that right? A. I think surface geology over there was non-existent.

"Q. You were supposed to have that done, weren't you? A. You can't get it from the surface. You have to do drilling to complete it. It's an integral part of it.

"The Court: Do you mean to tell this Court that you didn't have a geologist go over that land? A. Yes.

"Q. Where is his report? A. The first report was virtually negligent. He discredited it.

"Q. Have you any report in writing? A. Yes. We have some reports.

"Q. Did he tell you you would have to go down in order to get oil? A. The understanding first—

"The Court: What did he say? A. He said the first sand which would be topped there would be the Judith River.

"Q. You know as a matter of fact that there was only gas obtained there in the Judith River sand at the time you started drilling, isn't that a fact? A. Yes. We were trying to get enough information. There are two approaches to finding information for a deeper drill, that is, seismograph or slim holing aside from surface geology because many times geologists will tell you there isn't enough surface geology to do deep testing. We thought the best thing to do would be to do some slim holing in there and see how the tops and structures lay in their subsurface.

"Q. You were just doing exploration work, you weren't trying to complete a well? A. Both. If there had been commercial gas we would have completed it as a gas well."

It is clear that the requirement of a geological survey is part ██ of the consideration rather than a condition precedent. As such it must be pleaded and proven. R.C.M. 1947, section 13-511; 1 Bancroft's Code Pleadings, section 288, page 450. That the geological survey is part of the consideration was specifically recited in paragraph "Second." We do not have to indulge in the niceties of construction to determine that. This view is further strengthened by the rule that conditions are

not favored in the law. Atlantic-Pacific Oil Co. v. Gas Dev. Co., 105 Mont. 1, 69 Pac. (2d) 750.

In view of what has been said, the answer to the first question posed is that there was no issue in the case concerning the duty of the lessee to have a geological survey made.

We might observe further on this matter that a reading of the record does not support the trial court's finding that no geological survey was made. The record reveals, although neither side made any attempt to bring the matter out, that a geological survey of some description revealed no surface geology and that drilling, as was done, was necessary to determine oil and gas possibilities. This would indicate that some type of surface geology study was made, contrary to the trial court's finding. However, because of our answer to the first problem posed, it is not necessary to elaborate on this matter.

The second question is the crux of this appeal. Was the drilling commitment complied with as to reasonable diligence, both as to time and depth?

"Whether due diligence [in development of land under oil and gas lease] has been exercised depends upon facts and circumstances of each case." Fey v. A. A. Oil Corp., 129 Mont. 300, 285 Pac. (2d) 578, 588.

In 1949, when the instant lease was entered into, the area in Fallon County was "wildcat" area, far removed from any oil production. It was before the discovery of the Williston Basin oil potential. It was hundreds of miles from supply in raw country with extreme weather variations. The lessee was embarking on a wildcat exploratory venture as far as oil was concerned. There had been some previous gas production some ten miles distant. There had been some previous scattered drilling for oil without success.

We preface our discussion of due diligence by this recitation of conditions because we think that circumstances in new wildcat areas may determine due diligence quite differently from that in proven oil fields.

The trial court in its formal finding of fact did not state the

ultimate fact of whether or not the lessee diligently drilled its well to the Judith River sands, even though such a finding had been requested by the lessor. However, upon the oral argument on exceptions to the findings of the court, it is evident that the trial judge did find that the lessee diligently drilled until the Judith River sand was reached. At that time the lessee requested that the court make a finding concerning whether or not the lessee had diligently drilled to the Judith River sand. In answer to this request, the following took place, which is quoted from the record:

"The Court: Pardon me, Mr. Colgrove, but in XIII wouldn't that cover your suggestion, Mr. Sande? 'That for the purpose of ascertaining oil and gas possibilities within the area mentioned in the lease herein, the defendant, Mon-O-Co Oil Corporation, failed to prosecute drilling operations in good faith and with reasonable diligence until a well was completed.'

"Mr. Sande: It was our thought that that finding, because of the theory that has been adopted by the Court to the effect that we must have drilled to much deeper horizons, under no circumstances if that theory is correct does the proposition of due diligence come in.

"The Court: Wouldn't you be able to infer that from the probative facts that the Court has found? Couldn't you infer from VII there that they did use due diligence because it provides there 'on or about the 20th day of October, 1950, the Judith River sand was reached at a depth of about 1,367 feet'? Now, with that in there, could you not rightfully argue that it shows due diligence was exercised?

"Mr. Forbes: In that respect, Your Honor, I think that certainly could be argued but still when you look at what the Supreme Court would say, 'Did the Judge in accepting those facts find as a fact the drilling to the Judith River was done diligently?'

"The Court: That would be my theory, and that is the purpose that I put that in there so that you could infer the ultimate fact, namely, that diligence was pursued to that."

It is apparent from the foregoing exchange that the trial court considered that *due diligence was exercised to the depth of reaching the Judith River sands*. Then it must be determined whether or not such drilling to that depth was sufficient to satisfy the provisions of the lease. The lessor and the trial court took the view that such drilling was not sufficient and that a well should have been drilled to a much lower depth. It appears from the findings of the trial court that in 1949 and 1950 the Baker area had a prevailing gas sand within ten miles from the drilling operations of the lessee, and that there was no production of oil in any other sand formation nearer than 300 miles from the drilling operations of the lessee. There was therefore no known oil sand of any kind at or near the locality of the drilling operations, but there was a prevailing gas sand, the Judith River sand, where producing gas wells were located within ten miles from such drilling operations by the lessee. It also appears that there never had been an oil show in the Judith River sand in this general area.

It is the contention of the lessor, respondent herein, that the Judith River sand was not sufficient under the terms of the lease, because the lessee was not then testing for ''oil possibilities,'' but only for ''gas possibilities;'' it is the contention of the lessee, appellant herein, that drilling to the Judith River sand was sufficient since the lessee drilled to the only known and prevailing petroleum sand in the area.

In Fey v. A. A. Oil Corporation, supra, this court said: ''The paramount duty of the court is to ascertain the intent of the parties *at the time the contract was entered into* and to give effect thereto consistent with legal and equitable principles.''

In determining the intent of the parties in the instant case, the hereinbefore previously recited circumstances and conditions at the time and place indicate that to complete a well meant to commence drilling operations and continue to the only known producing horizon, the Judith River sand, and that the drilling and testing this only known horizon in the

area was sufficient completion of a well under the terms of an oil and gas lease here involved.

In Fey v. A. A. Oil Corporation, supra, this court held that it was reasonable diligence by the lessee to test the known sand for gas only, even though the contention was made that the failure to test for oil demonstrated a lack of diligence. The lease in the Fey case contemplated the production of either oil or gas, just as the lease in the instant case does. Therefore, testing the gas sand was a sufficient completed well under the terms of the lease.

The lessor and the trial court make the contention that even the lessee did not feel this was a sufficient completion of the well, since it thereafter proceeded to drill a "slim hole" down to the Eagle sand. It is evident from the record however that this deeper drilling was done on the basis of a geologist's report advising such deeper drilling. This report was not rendered until *after* the Judith River sand had been reached. Later developments in the Williston Basin demonstrated that a testing of lower sands was feasible and desirable, but we may not use later developments to determine what the intent of the parties was at the time. At the time the lease was entered into, a hole of sufficient size was started and drilled to reach and test the Judith River sands. Following this a lower exploratory test of the Eagle sand was made.

In 2 Summers Oil & Gas, section 350, page 262, it is said: "Where it is stipulated in the lease that the lessee, having commenced a well within the time limited therefor, shall drill to completion with due diligence, or it is expressly stated that the lessee shall complete a well within a certain time, or else pay delay rental or suffer forfeiture of his lease, the terms 'completion' or 'completed well' have been held to mean that the well must have been to such depth as to penetrate to the oil and gas sand in that community, or to such depth that the absence of oil or gas precluded the probability of finding it at a further depth. Obviously a well need not be a producing well to be completed." See Fey v. A. A. Oil Corporation,

supra; Pennagrade Oil & Gas Co. v. Martin, 211 Ky. 137, 277 S.W. 302; Kies v. Williams, 190 Ky. 596, 228 S.W. 40; Chapman v. Ellis, Tex. Civ. App. 254 S.W. 615; Howard v. Hughes, 294 Mich. 533, 293 N.W. 740; Minerva Oil Co. v. Sohio Petroleum Co., 336 Ill. App. 372, 84 N.E. (2d) 167; and Smith v.

As previously mentioned the trial judge cited the rule that in case of ambiguity or uncertainty, oil and gas leases are generally construed in favor of the lessor and against the lessee. This rule was recently restated in Schumacher v. Cole, 131 Mont. 166, 309 Pac. (2d) 311.

However, in Fey v. A. A. Oil Corporation, supra [129 Mont. 300, 285 Pac. (2d) 586], this rule was stated as follows: "While it is true that oil and gas leases in cases of ambiguity or uncertainty are generally construed in favor of the lessor and against the lessee and that it is the policy of the law to favor the forfeiture of oil and gas leases in order to prevent lands being burdened by profitless and unworked leases, see Abell v. Bishop, 86 Mont. 478, 284 Pac. 525; McNamar Realty Co. v. Sunburst Oil & Gas Co., 76 Mont. 332, 247 Pac. 166; Bowes v. Republic Oil Co., 78 Mont. 134, 252 Pac. 800, still 'One who seeks to enforce a forfeiture must himself be free from blame.' 37 C.J.S. Forfeitures section 5a, page 11. The rule is clear that the lessor who intends to claim forfeiture, where development is an element, has the duty to demand that development proceed or commence. 58 C.J.S. Mines and Minerals section 205, page 502; Storm v. Barbara Oil Co., 177 Kan. 589, 282 Pac. (2d) 417; Spikes v. Weller, 159 Kan. 597, 156 Pac. (2d) 540. There is no written notice of lack of development nor any notice to proceed therewith in this record until the notice of breach of lease of May 8, 1948."

In the instant case there was no written notice of any kind of lack of development until the lessor amended his complaint at the day of the trial. On the contrary, the lessor filed an affidavit attempting to obtain delay rental under the fourth provision of the lease on the theory that the well in question was a producer. On March 12, 1954, which was prior to the

expiration of the primary term of the oil and gas lease, the lessor filed for record a document which reads as follows:

"Affidavit of Nonpayment and Nondevelopment

"State of Montana } ss
"County of Fallon }

"Theodore Braun, being first duly sworn upon his oath deposes and says that he is the lessor referred to in an oil and gas mining lease dated the 25th day of May, 1949, which lease is recorded in Miscellaneous Volume Number 21, Page 491, of the county records of Fallon County, Montana, and which lease covers the following described lands, to-wit:

"(W½ NW¼) West one-half of the Northwest quarter, Sec. 23, Township 7 North, range 60 East M.P.M.

"And further, deponent says that on the twenty-fifth day of May, 1953, under the terms of the lease, there should have been paid to him or deposited to his credit in the Bank of Baker, at Baker, Montana, the sum of Forty Dollars ($40.00), the payment of which was necessary in order to keep the above-described lease in force and effect. Deponent hereby swears the above payment has never been made to him or his representatives in money or otherwise, nor has it been deposited to his credit in the above bank.

"And further, deponent says that there has been no drilling or development of any nature or kind whatsoever done on the land covered by the lease referred to herein, as called for under the terms of said lease.

"Witness my hand this 12th day of March, 1954.

"Theodore Braun"

The afore-quoted affidavit was filed under the mistaken apprehension that the lessee had found oil or gas in commercial quantities in the well on adjacent lands in the township and became obligated to pay delay rentals or drill on the lessee's land within one year as provided in the lease. At that time when the lessor thought he would benefit, he fully recognized that the oil and gas lease was valid. He recognized that on May 25, 1953, the lease was valid because he stated that on that

day he was entitled to receive delay rentals. The record reveals that the lessee had spudded in for a deep test well on March 6, 1954. Immediately after, on about March 16, the lessor attempted to disavow the lease and declare it forfeited and void.

For the lessor to attempt to reap the benefits of the lease ▇ in the event it was a producer on the one hand, and on the other hand to state there was not sufficient drilling operations to validate the lease, is repugnant.

We hold then that the drilling commitment was complied ▇ with as to reasonable diligence both as to time and depth.

The third question posed is whether, if the lease was still in effect some 70 days prior to the expiration of the term, the lessee was excused from any further exploration and development by virtue of the act of the plaintiff in attempting to repudiate the lease.

The trial court did not rule on this question since it had held that the repudiation of the lease was not wrongful as previously discussed. The respondent, in his brief, contends that the lease had *ipso facto* terminated upon failure of the lessee to comply with a condition of the lease.

In Fey v. A. A. Oil Corporation, supra, this court said: "Where a lessee, as in this case, was ready, able and willing to drill further wells and develop the lessor's property, an attack upon the lessee's title by lessors will relieve the lessee of the duty either to proceed with the drilling operations or the payment of the delay rentals specified during the contest of his title. See Twyford v. Whitchurch, 10 Cir., 132 F. (2d) 819, and cases cited. Compare Hudson v. Lyons, 199 Okl. 348, 186 Pac. (2d) 309, which is a case of somewhat similar facts, where lessors interfered with lessees moving equipment upon the leased premises. The court held: Where lessors of oil and gas lands have brought suit against the lessee for cancellation of the lease, they are not in a position to complain of the inactivity of the lessee during pendency of such suit. Steven v. Potlatch Oil & Refining Co., 80 Mont. 239, 257, 260 Pac. 119;

Brooks v. Arkansas-Louisiana Pipe Line Co., 8 Cir., 77 F. (2d) 965, 970; Elsey v. Wagner, 199 Okl. 449, 183 Pac. (2d) 829; Hudspeth v. Schmelzer, 182 Okl. 416, 77 Pac. (2d) 1123; Spikes v. Weller, 159 Kan. 597, 156 Pac. (2d) 540. Lessor's repudiation if not withdrawn is a continuing legal excuse for lessee's refusal to perform. Williston on Contracts, section 1334, page 3748; Restatement of the Law of Contracts, section 320, page 482; Merrill, Covenants Implied in Oil and Gas Leases, 2d Ed., section 70, page 177; Alphonzo E. Bell Corp. v. Listle, 74 Cal. App. (2d) 638, 169 Pac. (2d) 462.''

What was said in Steven v. Potlatch Oil & Refining Co., 80 Mont. 239, 257, 260 Pac. 119, 124, cited in the Fay case, applies here:

''After giving the defendants the demand asserting the lease had come to an end and that the defendants had no further rights in the premises, the plaintiffs will not be heard to complain that the defendants did not continue further exploitation.

''Upon the facts the plaintiffs were not warranted in making the demand nor in commencing the action. Their vaulting ambition, like Macbeth's, o'erleaped itself.''

We hold, then, that the plaintiff wrongfully repudiated the ▮ lease 70 days before its expiration and that the defendant lessee is entitled to 70 days from the date of entry of judgment, in conformity with this opinion, in the court below in which to conduct drilling operations under the terms of the lease.

From what has been heretofore said, the judgments of the district court entered in district court causes numbered 3365, 3366, 3367 and 3368 are reversed with directions to enter judgment in conformity with this opinion.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICES ANGSTMAN and ADAIR, concur.