LYON ET AL., APPELLANTS, *v.* DAILEY COPPER M. & S. CO. ET AL., RESPONDENTS.

(No. 3,144.)

(Submitted September 11, 1912.   Decided September 23, 1912.)

[126 Pac. 931.]

*Contracts — Several Writings — Construction — Corporations — Acts of Officers—Waiver of Rights of Principal.*

Contracts—Several Writings—Construction.

1.  Plaintiff agreed with defendant mining corporation, among other things, to "enter into a contract for the sale of its entire block of treasury stock" in consideration of receiving a specified number of shares.  In a subsequent letter to the corporation he stated the understanding was that he was to be entitled to the shares when he had completed the sale of the treasury stock.  While he performed all other terms of the agreement, he failed of accomplishment in this regard, and abandoned the enterprise after selling a small portion of the stock.  *Held*, under section 5031, Revised Codes, that the several writings constituted but one agreement; that the letter incorporated in it as a condition precedent to becoming entitled to the shares he was to receive, the actual sale of all the treasury stock, and that by relinquishing the enterprise he had lost his right to claim under the contract.

Same—Construction.

2.  Where, after applying the ordinary rules of construction, any uncertainty remains in the terms and expressions employed in a contract, they must, under section 5043, Revised Codes, be construed most strongly against the party who drew it up—plaintiff (an attorney) in this instance.

Same—Corporations—Acts of Officers—Waiver of Rights of Corporation.

3.  Evidence offered tending to show that certain officers and directors of defendant corporation did not rely on the contract referred to in paragraph 1, *supra*, but had waived any rights thereunder, was properly excluded; they were not parties to the agreement and could not admit away the right of the company to the stock claimed by plaintiff which he had failed to earn.

*Appeal from District Court, Jefferson County; J. B. Poindexter, Judge.*

ACTION by T. T. Lyon and others against the Dailey Copper Mining and Smelting Company and others.  From a judgment for defendants and an order denying plaintiffs a new trial, the latter appeal.  Affirmed.

*Mr. M. H. Parker*, for Appellants, submitted a brief.

*Messrs. Walsh & Nolan,* for Respondents, submitted a brief; *Mr. C. B. Nolan* argued the cause orally.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Action in claim and delivery. Plaintiffs seek to recover judgment awarding them possession of 200,000 shares of the capital stock of the defendant, the Dailey Copper Mining and Smelting Company, hereafter referred to as the company. They allege title and right to immediate possession, and unlawful detention by the defendants, to their damage in the sum of $10,000. They further allege that the company, through the other defendants, its officers, and such other defendants, have conspired together with one Heath, a stock-broker residing in the city of New York, to cheat and defraud the plaintiffs out of their stock, and that they, thus acting, have been guilty of oppression and malice. An additional sum of $10,000 is demanded in this behalf as punitive damages. The answer consists of a denial of all the allegations in the complaint, except the corporate capacity of the company, and alleges a counterclaim for money had and received by the plaintiff Lyon for the use and benefit of the company, amounting to $11,369, for which judgment is demanded. At the trial the counterclaim was abandoned.

The controversy grew out of certain engagements entered into by plaintiff Lyon with the Dailey Copper Company (the same corporation as the defendant company, the name having been changed, as will appear hereafter), the character and purport of which are disclosed by the following recital: Prior to February 20, 1908, the capital stock of the company consisted of 350,000 shares of the par value of one dollar each. The plaintiff Lyon then held a lease and bond upon all of its property, the term of which had not expired. He had been endeavoring to sell it in the market. The company held under lease and bond, with an option to purchase, the Steamboat quartz lode claim, which lies contiguous to the property owned by it. At a meeting of the stockholders of the company held on the date above mentioned, and at the suggestion of Lyon, by resolution

unanimously adopted, the name of the company was ordered changed to that under which it is sued in this action. By another resolution it was determined to increase the capital stock from 350,000 to 1,500,000 shares of the same par value. The directors were authorized to take the steps necessary to effectuate both resolutions. The number of shares of stock then issued and outstanding was 200,000, all held by five persons, including the three defendants, W. W. Dailey, Charles H. Dailey, and A. J. Dailey, respectively the president, secretary, and vice-president of the company; each owning 40,000 shares. It was thereupon agreed by all of them to surrender these shares, and to accept in lieu thereof 160,000 shares each of the new stock, leaving 700,000 shares in the treasury, to be disposed of by subsequent arrangement to obtain funds for the purpose of developing the property of the company. Lyon then submitted the following offer:

"To the Stockholders and Directors of the Dailey Copper Company, Wickes, Montana—

"Gentlemen: Understanding that you have voted to increase the capital stock of your company from 350,000 to 1,500,000 shares, and that the stockholders have agreed to accept 800,000 shares of said stock in exchange for the 200,000 shares heretofore held in said company, leaving 700,000 shares of unissued stock, I hereby make you the following proposition: I hereby offer you in exchange for and in full payment of the said 700,-000 shares of unissued stock that certain lease and bond which I hold upon the Steamboat quartz lode mining claim, said claim being known and designated as survey No. 690, lot A, situate at Wickes in the county of Jefferson and state of Montana; I also agree to do and perform all necessary legal work in carrying into effect the action of your stockholders in voting to increase the capital stock of your corporation, and will pay all the necessary legal fees in connection therewith, so that the said action may be carried into full force and effect without cost to your corporation; in the event of this proposition being accepted, I also agree to turn over to the treasurer of your corporation, of

the 700,000 shares issued to me, 500,000 shares thereof, such stock to be sold as treasury stock at the best price obtainable, with a view to provide working capital for the corporation; I will also further agree with your board of directors to enter into a contract with them for the sale and disposition of the said 500,000 shares of treasury stock upon such terms and conditions as will net the corporation $200,000. Dated this 20th day of Feby., 1908.''

The offer was accepted by formal resolution, which also authorized the president and secretary, acting in connection with the board of directors, to contract with Lyon for the disposition of the whole of the treasury stock upon such terms as the directors thought proper. Thereupon, it having been agreed further that the directors might hold a meeting without the usual notice, the stockholders' meeting adjourned. The board met and by resolution formally authorized the president and secretary to contract with Lyon for the sale of the treasury stock as proposed by him, which they did, as is evidenced by the following writing:

''This agreement made and entered into this 20th day of February, 1908, by and between the Dailey Copper Company, a corporation duly organized and existing under and by virtue of the laws of the state of Montana, the party of the first part, and T. T. Lyon, of Butte, Montana, the party of the second part, witnesseth: Whereas the Dailey Copper Company, party of the first part as aforesaid, having this day by a vote of its stockholders increased its capital stock from $350,000 to the sum of $1,500,000, divided into shares of the par value of one dollar each; and whereas, by an arrangement with its stockholders through proper proceedings had therefor, the said party of the first part, the Dailey Copper Company aforesaid, has set aside and placed in the hands of its treasurer 500,000 shares of its said capital stock, the same being full paid and nonassessable, and designated as treasury stock, to be sold and the proceeds thereof to be used for the benefit of said company, the party of the first part aforesaid; and whereas, the stockholders of the

Dailey Copper Company, party of the first part aforesaid, having by proper resolution adopted at their meeting held this the 20th day of Feby., 1908, duly authorized the board of directors of said the Dailey Copper Company to negotiate with and to enter into a contract with the said T. T. Lyon, party of the second part, for the sale of the entire block of the said treasury stock consisting of 500,000 shares as aforesaid:

"Now, therefore, in consideration of the premises and the sum of one dollar in hand paid, the receipt whereof is hereby acknowledged, the said party of the first part agrees to and with the said party of the second part as follows, to wit: That the said party of the second part shall have the exclusive right and privilege of selling the said 500,000 shares of treasury stock for a period of two years from the 5th day of March, 1908, at and for the sum of $200,000 net to the said party of the first part; provided the said party of the second part shall pay, or cause to be paid, into the treasury of the said party of the first part not less than the sum of $7,500, within ninety days from and after said 5th day of March, 1908, as the result of stock sold during said period; and within three months thereafter, as the proceeds of stock sold, the sum of $13,500, and will during the succeeding six months pay into the treasury as the proceeds of stock sold not less than the sum of $29,000, and will during the succeeding twelve months pay into the treasury the balance sum of $150,000, making the total sum so paid into the treasury of the said party of the first part the sum of $200,000. It being understood and agreed that the said party of the second part shall have the right and privilege of accounting to the said party of the first part for the first 200,000 shares of stock sold at the rate of 25 cts. per share net to said party of the first part, and that the remaining 300,000 shares shall be paid for at the rate of 50 cts. per share net to the party of the first part. It is further specially understood and agreed that the said party of the first part will issue and deliver to such persons as the said party of the second part may designate the number of shares that shall be paid for at the rates above set forth, the money

therefor to be deposited with some agent hereafter to be agreed upon, to whom such shares of stock may be delivered and who will collect therefor and remit the money received to the treasurer of the said party of the first part.

"In witness whereof, the said the Dailey Copper Company has caused its corporate seal to be hereunto affixed and its corporate name to be subscribed hereto by the president and secretary thereof, and the said party of the second part has hereunto subscribed his name and affixed his seal this the 20th day of February, 1908.

"W. W. DAILEY, Prest.

"C. H. DAILEY, Secty.

"T. T. LYON.  [Seal.]

"[Corporate Seal.]   THE DAILEY COPPER COMPANY,

"Wickes, Montana.

"T. T. LYON, Direct."

At the same time, and as a part of the same transaction, Lyon addressed to the company this communication:

"Gentlemen: Referring to the contract and agreement entered into by and between us this day, it is understood by and between us that when I have completed all the necessary work and have paid all the fees in connection with the increase of the capital stock of your corporation, I may have issued to me of the stock I am to receive 20,000 shares, which I agree not to sell, but will use as a basis of credit, and that in the event of my failure to carry out the terms of my agreement with you to your satisfaction I will return all of said stock to you upon repayment to me of the moneys actually expended by me in paying of fees for the said increase of capital stock. It is also understood between us that in the event of my making a success of the sale of your treasury stock in accordance with our agreement, that should it become necessary for me to have more of the stock to which I shall be entitled, that there may be issued to me from time to time additional shares until the number so issued shall reach 50,000 shares. It is further understood that the remaining 150,000 shares shall remain with the secty. of

46 Mont.—8

your company until the final termination of said contract; it being understood by and between all the stockholders of said company that they will all leave their stock with the secty. of the company until the termination of the said contract, unless by mutual agreement among all of them they decide to sell some portion thereof, in which event it is understood that each stockholder shall sell only *pro rata* with the others.

"T. T. Lyon."

Lyon is an attorney at law, residing and practicing his profession at Butte. Prior to any of the transactions heretofore narrated, there had been negotiations between him and the officers of the company, and in a preliminary way it had been agreed to carry out the scheme which they perfected at this meeting. Lyon, being the attorney for the company, had theretofore prepared all the resolutions and the various writings quoted, and had them at the meeting. After entering into his engagement with the company, he assigned to each of the other plaintiffs an interest in the 200,000 of stock mentioned therein. He attended to all the steps necessary to legalize the change in the name and the increase in the capital stock of the company, paying the incidental expenses, amounting to $306. He also obtained a new lease and bond on the Steamboat claim and turned it over to the company. This, however, was without expense to him. The 700,000 shares of treasury stock were never issued to Lyon. On March 20, 1908, the officers of the company having in the meantime procured a new stock-book, there was made a certificate for 500,000 shares in the name of Lyon. It was immediately assigned by him to the secretary of the company. A second certificate for the same number was then made out in the name of the secretary. Neither was taken from the stock-book. Two other certificates were made out to Lyon, one for 180,000, and the other for 20,000 shares. The latter was delivered to Lyon; the former remained in the stock-book. Five certificates for 180,000 shares each were made for each of the original stockholders, including the three defendant officers. These were also left in the stock-book, but were subsequently canceled and other

certificates issued in their stead, presumably directly to Heath, in order to perfect a sale of them to him, as will be shown hereafter. Lyon then went to New York and other eastern cities to effect sales. He took with him 20,000 shares of treasury stock, and 20,000 shares of the 200,000 shares allotted to him under his contract, leaving the balance of 180,000 of this amount in the hands of the secretary. The owners of the 800,000 shares left their certificates with the secretary, with the understanding, as is evidenced by the communication by Lyon to the company, that all the shares, other than the 500,000 in the treasury and the number of shares issued and to be issued to him, were to be held until all the treasury stock should be sold. These facts are gathered from the testimony of Mr. Lyon. His statement, together with the writings quoted above and the records of the company introduced as exhibits during his examination, constitute all the evidence heard at the trial. He testified, further, that he found the market dull, and was unable to sell more than 50,000 shares, for which he received a gross return of $7,400; that this amount he had applied on his expense account, except the sum of $3,250, which he had paid into the treasury of the company; that these sales included the 20,000 shares first issued to him personally, to be used "as a basis of credit," together with 5,000 shares issued thereafter for a like purpose; that, being unable to effect other sales because of the dullness of the market, he ceased the effort to do so; that his contract with the company was abandoned, and it was agreed between him and the Daileys that the 800,000 shares held by the other stockholders could be withdrawn from the hands of the secretary and sold; that he thereupon effected an arrangement with Heath for the sale of the whole of the 800,000 shares held by the other stockholders at a gross price of $65,000; that it was then agreed between Lyon and the three defendants, the Daileys, that the shares theretofore sold by Lyon should all be treated as treasury stock; and that upon his return to Montana he demanded that his shares to the full number of 200,000 be issued to him, but that the defendants refused to issue and deliver them. We

quote from his statement the following: "Under this contract I undertook to sell the treasury stock. All told; I spent thirteen months in the east; was back and forth. In fact, I just came back once, and went back again. I sold sufficient stock to put $3,250 in the treasury. I found it was impossible to sell treasury stock, and needed the assistance of somebody that was in a position to sell the stock. I therefore opened up negotiations with Will Dailey and the Dailey boys to ascertain what they would take for their stock. I saw we would have to get some eastern people in the deal having financial backing to carry it out. As a result of that, I secured a price and executed a contract with Heath and them, whereby he agreed to pay them $60,000 or $65,000. Upon that contract he paid them $25,000 in cash, so that I put $3,250 in the treasury and paid them $25,000. While I was there at this business I sold approximately 50,000 shares of the treasury stock. After my return I had a conversation with the Daileys, and I told them of the situation. They seemed perfectly satisfied; very agreeable that the amount of stock which I sold should all be charged as treasury stock and accounted for by the amount of money which I had turned into the treasury. It was within a cent per share of the amount they were selling the stock for. * * * I had a separate, distinct contract after the consummation of the first one. I entered into a contract for the disposal of the treasury stock on the 20th of March. It is the same contract referred to in this agreement of the 20th of February. I did not carry out this contract, the terms of this contract of the 20th of March; we abandoned that contract. I found the conditions such that I could not dispose of the stock. I did not make one of those payments as provided for in the contract of the 20th of March; but the company accepted money long after they might have canceled the contract. In fact, they were always willing to receive money whenever I sent it to them. I believed that I had a right to the certificate for 200,000 shares of stock the very moment it was issued, with this exception: That we agreed among ourselves there that we would all leave our stock

in the book.   At the time it was issued, I had a perfect right to the 200,000 certificate of stock.   *   *   *   From February 20 until March 10, I had performed all of the work required in connection with the increase of the capital stock and the changing of the name of the corporation.   I prepared those three contracts; prepared those minutes; that was all I claim to have done.   On March 10 these certificates were issued.''

In another place in his testimony he said: ''All of these agreements were a part of the same transaction, and had to do with the 200,000 shares of stock that I was to own.   This agreement, if you will permit me to explain, had to do with the carrying out of my first agreement; that is, the incorporation of the company and the payment of fees.   It had nothing to do with the sale of the treasury stock.   That contract further provides that it was understood between us that in the event of my making a success of the sale of the treasury stock—that was the stock that was covered by contract referred to here as Exhibit A, attached to the answer; but at the time that was written the proposition arose—in fact, I think Will Dailey suggested: 'You go down east.   If you cannot sell any stock, cannot do anything, we do not want you stuck for the cost.   If you cannot do anything, and want to give back the stock, we will give you back the money.'   'If it is impossible for me to do anything,' I said, 'I do not want the stock.'   There was never any objection on their part as to the sale of this stock.   This agreement, like all of the others, contained the terms of the contract, with the exception that when I came back I entered into an altogether different contract.''

During the course of his examination, counsel for plaintiffs offered to have him testify that at different times after April, 1909, and prior to the commencement of this action, he made demand upon the defendants Dailey for the delivery to him of his shares, but that they refused such delivery, giving as their only reason for such refusal that they had entered into an arrangement with Heath, under the terms of which they would not deliver any stock to plaintiffs until the consummation of the agreement theretofore entered into between themselves and

Heath for the sale of their own stock. The offer was refused, on the ground that the evidence was immaterial and incompetent. The plaintiffs having rested, the court, on motion of defendants, directed a judgment of nonsuit, on the ground that under the terms of the contract title to the 200,000 shares of stock allotted to plaintiff Lyon was not to vest in him until he had fully consummated the sale of the 500,000 shares of treasury stock and paid into the treasury of the company $200,000, and that it appeared from the evidence that he had failed to do so. Plaintiffs have appealed from the judgment and an order denying their motion for a new trial.

At the hearing in this court, defendants objected to the consideration of the appeals because of the omission from the transcript of certain portions of the record, and because the brief furnished by counsel for plaintiffs fails in important particulars to comply with the rules of this court. Since, however, we are able to examine the case on the merits without inconvenience, we shall do so, though, under a strict application of the rules, the appeals are subject to be dismissed.

In directing judgment the trial court proceeded upon the theory that the three writings constituted one entire contract, and that, it being apparent from Lyon's testimony that he had failed to consummate the sale of the treasury stock as he agreed, he never became entitled to the shares allotted to him. According to the terms of his offer as formally accepted at the stockholders' meeting, title was to vest upon his performance of four engagements: (1) To secure a new lease and bond on the Steamboat claim and turn it over to the company; (2) to take the legal steps necessary to effectuate the change ordered in the name of the company and the increase in its capital stock; (3) to pay the incidental expenses; and (4) to enter into a contract with the officers of the company, in connection with the directors, for the sale of the 500,000 shares of treasury stock upon such terms as would net the company $200,000. That he fully performed all these engagements the record shows clearly. If nothing else appeared, the conclusion would therefore be inevitable that upon the formal signing and delivery of the con-

tract on March 20 (for at that time all the other engagements had been met) he became vested with title to the shares allotted to him; for by the terms of his offer the whole of the treasury stock was to be issued to him, and out of this he was to retain 200,000 shares, returning the rest to the treasury. This was to be reissued in lots to purchasers designated by him, as sales were made from time to time. Difficulty is encountered, however, when we consider the third writing which accompanied his offer, and was in the hands of the officers and stockholders at the time his formal offer was accepted, and at the time the formal agreement was executed. For, though this was done on March 20, it was a part of the transaction of February 20, the same as if it had been executed on that date. This is indicated by the date, and also by the testimony of Lyon when he stated that "all of these agreements were a part of the same transaction, and had to do with the 200,000 shares of stock that I was to own." It must therefore be regarded as supplementing the contract formed by his first offer and its acceptance by incorporating in it a condition precedent, *viz.*, that he was to be entitled to his stock when he had completed the sale of the treasury stock. Otherwise it could not have anything to do with the sale of the treasury stock as Lyon stated, but must be understood as embodying only an agreement between Lyon and the other stockholders touching the pooling of their stock. That it cannot be so taken is apparent from the fact that it is addressed to the company and not to the stockholders, and the statement made in it that the understanding was that, in the event of his failure to carry out the terms of his agreement to the satisfaction of the company, he would return the 20,000 shares issued to him, upon being reimbursed in the amount he had paid out on its behalf. The recital of the additional understanding between him and the company, immediately following the statement of the agreement on this point, recognizes distinctly that the company reserved the right to retain the stock pending his performance of the contract, and was not bound to issue him any other shares than the 20,000, which were to be issued conditionally, and to be returned on the condition named,

in case he failed to perform the contract. The last sentence, it is true, conveys the information that all the stockholders had made a pooling agreement; but, in view of the preceding recitals, this statement must be held to refer to stockholders other than himself, *viz.*, stockholders who owned their stock absolutely, and were therefore entitled to withdraw it without condition, and not to import an understanding between him and the company that, upon a mutual agreement reached by himself and the other stockholders, he was to be at liberty to withdraw unconditionally, or at all, the stock allotted to him and to be earned under the contract.

In the light of Lyon's testimony, as well as because of the recitals in the writings themselves, all having relation to the same [1] subject matter, the last referring to the others, the intention of the parties must, we think, be ascertained by construing all of the writings together as one entire contract. This is in accord with the rule declared by the statute: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Rev. Codes, sec. 5031; see, also, *Talbott* v. *Heinze*, 25 Mont. 4, 63 Pac. 624; *Cornish* v. *Woolverton*, 32 Mont. 456, 108 Am. St. Rep. 598, 81 Pac. 4; *Bartels* v. *Davis*, 34 Mont. 285, 85 Pac. 1027; 9 Cyc. 580.) Other rules of construction pertinent here are the following: "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Rev. Codes, sec. 5025.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Id., sec. 5030.) "A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." (Id., sec. 5036.) "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Id., sec. 5038.) Applying these rules, the conclusion seems necessary

that Lyon was not to become the absolute owner of any of the shares allotted to him until he had fully consummated the sale of the treasury stock, as he engaged to do under the formal agreement. The abandonment of the contract did not change his position or rights with reference to the stock, even though it be conceded that he is entitled to compensation for what he did. By relinquishing the enterprise, he lost his right to claim under the contract. It is admitted by him that he did not consummate the sale, but that the agreement was abandoned and a new agreement entered into. This end was the ultimate end sought to be accomplished; the result aimed at being the development of the property and the enhancement in value of its capital stock. This ultimate end was not accomplished.

Lyon was the attorney of the company. He drew up all the [2] agreements. The terms and expressions employed are his. If any uncertainty remains in them, after applying the ordinary rules of construction as we have done, these terms and expressions must be construed most strongly against him. (Rev. Codes, sec. 5043; *Bickford* v. *Kirwin,* 30 Mont. 1, 75 Pac. 518; *Blankenship* v. *Decker,* 34 Mont. 292, 85 Pac. 1035.)

Contention is made that the court erred in excluding the [3] offered evidence in that it tended to show that the Daileys did not rely on the contract, and hence that they waived and abandoned any rights under it. Omitting reference to any other purpose for which the evidence might be held admissible, it was not admissible for the purpose for which it was offered. Though the Daileys were officers and directors of the company, they were not parties to the contract. If it be conceded that by virtue of their relationship to the company they might waive performance of the stipulations of the contract, so as to release Lyon from liability for his failure to perform them, they could not by so doing admit away the right of the company to retain the stock, Lyon confessedly having failed to earn it. Nor, by failing to put their refusal upon the proper ground, did they estop the company from asserting that it has not parted with its title. There is no element of estoppel involved.

The action of the district court in ordering the nonsuit was correct. The judgment and order are affirmed.

*Affirmed.*

Mr. Justice Holloway concurs.

Mr. Justice Smith did not hear the argument, and takes no part in the foregoing decision.