JOHN FEY, ALSO KNOWN AS JOHN G. FEY, AND ROSA J. FEY, PLAINTIFFS AND RESPONDENTS, v. THE A. A. OIL CORPORATION, L. C. STEVENSON, SWEET GRASS ARCH APEX SYNDICATE, L. C. STEVENSON, TRUSTEE, AND JOHN REYNOLDS, DEFENDANTS AND APPELLANTS.

No. 9223.
Submitted December 6, 1954. Decided June 17, 1955.
As Amended on Denial of Rehearing July 25, 1955
285 Pac. (2d) 578.

302

McCabe & McCabe, Great Falls, Hans Walchli, Kalispell, Keller & Magnuson, Helena, for appellants.

Louis P. Donovan, Shelby for respondents.

Patrick L. Donovan, Shelby, E. K. Cheadle, Billings and Leif Erickson, Helena, all associate counsel for respondents on rehearing only.

Mr. Melvin E. Magnuson, Mr. E. H. McCabe, Mr. Paul T. Keller, Mr. Walchli and Mr. Louis P. Donovan argued orally.

MR. JUSTICE BOTTOMLY:

This is an appeal from a judgment in favor of plaintiffs and against defendants, the A. A. Oil Corporation, L. C. Stevenson, Sweet Grass Apex Syndicate, L. C. Stevenson, trustee, and John Reynolds.

The plaintiffs filed and prosecuted a quiet title action. Trial was had before the court without a jury October 21 and 22, 1949, resulting in the court's findings of fact and conclusions of law which were incorporated in its judgment made and entered on the 7th day of August 1951. Thereafter a motion was made by defendants for a new trial. A hearing was had thereon after which the court made his order denying the same on October 5, 1951.

This appeal followed.

The plaintiffs, John Fey, also known as John G. Fey, and Rosa J. Fey, were and are husband and wife. The A. A. Oil Corporation was and is a corporation, organized under the laws of Montana. L. C. Stevenson, Sweet Grass Apex Syndicate, was a business trust estate and L. C. Stevenson was and is the trustee of said estate.

The record shows that at all times pertinent to this controversy John Fey was owner in fee simple of certain real property situated in Toole County, Montana; that at all times pertinent hereto Rosa J. Fey was the owner in fee simple of certain real property situated in Toole County, Montana; that the plaintiffs John Fey and Rosa J. Fey were at all times herein the owners in fee simple as tenants in common of certain real property situated in Toole County, Montana, all of said lands being set forth and particularly described in the complaint of the plaintiffs herein.

There is no dispute as to the ownership of the lands. The record further discloses that on or about the 4th day of April 1940, the plaintiffs, John Fey and Rosa J. Fey, made, executed and delivered to defendant John Reynolds an oil and gas lease, covering the described premises consisting of 9,265 acres, more or less, as described in plaintiffs' complaint.

All of the above mentioned lands were subject to the rights of the defendants under the terms of a certain oil and gas lease made, executed and delivered to defendant John Reynolds on the 4th day of April 1940, and the amendments and extensions thereof as of April 14, 1941, and June 24, 1941.

This original oil and gas lease was duly assigned by John Reynolds to the A. A. Oil Corporation and L. C. Stevenson, Sweet Grass Apex Syndicate, L. C. Stevenson trustee. There is no dispute in regard to the original lease nor the assignments thereof.

The lease of April 4, 1940, contained the following provisions: "It is agreed that this lease shall remain in full force for a term of five years from this date and as long thereafter as oil or gas, or *either of them,* is produced from said land by the lessee.

"First. To deliver to the credit of lessor, free of cost in the pipe line to which lessor (lessee) may connect the wells, the equal 1/10th part of all oils produced and saved from the leased premises.

"Second. To pay the lessor ten per cent royalty dollars each year, in advance for the gas from each well where gas only is found; *while the same is being used off the premises* [emphasis ours], and lessor to have gas free of cost from any such well for stoves and inside lights in the principal dwelling house and all other buildings on said land during the same time by making his own connections with the well at his own risk and expense. * * * If no well be commenced on said land on or before the 4th day of April, 1941, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to lessor's credit in the First International Bank

of Sweet Grass [Montana] or its successors * * * the sum of 12½ cents per acre every six months in advance, which shall operate as a rental and cover the privilege of deferring the commencement of a well for six months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited, herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid and any and all other rights conferred.''

During the years of 1940 and 1941 and the following years drilling equipment was almost impossible to get owing to war conditions and regulations which allocated metals and casings to the most critical projects. After strenuous efforts being made on behalf of the defendants, and no material available, they met with the plaintiffs at Gold Butte, Montana, and executed the following instruments: ''Gold Butte, Montana, April 14, 1941. To L. C. Stevenson, Helena, Montana, as representative and fiscal agent, John Reynolds and the A. A. Oil Corporation:

''It is hereby agreed now that in event the A. A. Oil Corporation as operators and successors to John Reynolds, for their own and said Reynolds' account, find that it is empowered and its management duly authorized to and desires to during the next ensuing three months resume payment of rentals, etc., in amounts and under the terms as set out in the original oil and gas lease referred to on reverse side hereof, I, we agree to then accept same for amounts due for first and second six months or half year portions and periods of said original lease and will apply said rentals henceforth to purchase shares if and as then offered for subscription of equal or equivalent amount at not to exceed par value of $1.00 per share in the said A. A. Oil Corporation, of Montana; and as further consideration in such event I we agree to extend the life term of said lease for

one year additional beyond its original life term on the same general terms as provided in its original form.

"[Signed] John G. Fey

"Rosa J. Fey

"Witness: John Reynolds"

At the same time and place the following instrument was executed:

"Gold Butte, Montana, April 14, 1941

"To L. C. Stevenson, Helena, Montana, as representative for parties agreeing to do development work henceforth on the Rogers Island Apex Structure areas in northeast Toole County, Montana. In consideration of $1.00 good faith money received and of services to be rendered and conditional upon performance of the development work and other conditions herein stipulated to be done and met, and the further considerations to be received, as hereinafter provided, I/we, hereby confirm the existence of and declare in good standing now and grant continuance in force as per its term, for one year without rental execpt as herein otherwise provided, oil and gas lease dated 4th day of April, A. D., 1940, given by John G. Fey and Rosa J. Fey of Gold Butte, Montana, to John Reynolds of Great Falls, Montana, covering: lands in Toole County in Township 37, north of range two and three east of Montana Principal Meridian; and lands in north half of Township 36, north of range two and three east Montana Principal Meridian, provided that unless an oil gas test well was commenced on a location on above described lands or on some other lands within the structure area mentioned in Township 37 north range two and three east of Montana principal Meridian as soon as the necessary leases can be put in order and in no event later than July 15, 1941, this agreement shall be of no force or effect; and, also unless such well when so commenced or another in the event of the loss of the first hole is thereafter prosecuted with reasonable diligence to completion to the Madison limestone formation or to commercial production at the lessor depth, this agreement shall

at my/our option become null and void and of no effect as to waiver of any part of rentals, and I/we shall then be entitled to receive all such rentals in full or else to have said lease terminated upon written notice of default as above, unless within five days of written notice of default being served work be not resumed as herein called for; provided, further that if said test well is not located and drilled on my/our land herein referred to, then whenever said first structure test well is duly completed and put on production, lessee, his/its successors or assigns shall commence a test well upon my/our lands herein described on or before ninety days thereafter or resume payment of regular rentals until such test well is commenced on my/our lands; provided, also, that in any event the first structure test well, wherever located and drilled on the structure, is to be completed and (if said first test is not on my/our land) a test well commenced on my/our land herein described not later than one year from this date, or regular rental payments resumed at each and every regular rental date thereafter as provided in said lease until such test well on my/our land shall be commenced and drilled, or the lease terminated as provided herein; provided, also, that if the development operations and other conditions are performed and complied with in entire good faith, all as herein set out, then a one-year extension in the terms of said lease is hereby given; but not otherwise.

"[Signed] John G. Fey

"Rosa J. Fey"

"Witness: John Reynolds"

On June 24, 1941, another instrument was executed by John G. Fey, the A. A. Oil Corporation, L. C. Stevenson, president, and John Reynolds, as follows:

"Receipt for lease rentals and considerations. Receipt is hereby acknowledged from the A. A. Oil Corporation, for itself and John Reynolds, of lease rentals and considerations, accrued and to accrue to and including July 1st, 1942, on that certain oil and gas lease dated 4th day of April, A. D., 1940,

given by John G. Fey and Rosa J. Fey, lessors, of Gold Butte, Montana, to John Reynolds, lessee, of Great Falls, Montana covering all lands in Toole County in Township Thirty-Seven (37) north Range Two (2) and Three (3) east of MPM; and all lands in north half of Township Thirty-six (36) north of Range Two (2) and Three (3) east MPM; and in further consideration of said payment made and of services to be done by lessee and assigns, I/we stipulate the following amendments and provisions in said lease; which are agreed and assented to by lessee and assigns by signing this instrument. A. That the time of said lease shall be increased or extended to five years from and after July 1st, A. D., 1941, subject to compliance with its original and herein amended conditions; B. That the special written in clause with respect to lessee paying lessors' taxes on said lands is hereby eliminated, and in lieu thereof the regular rental clause is amended to read: 'Seventeen and one-half cents ($17\frac{1}{2}\cancel{c}$) per acre' as the semi-annual rental, instead of 'Twelve and one-half cents ($12\frac{1}{2}\cancel{c}$) per acre,' as originally made out; C. That in event any gas well drilled by lessee or assigns is not regarded by lessee as a commercial gas well and abandonment by lessee is contemplated, lessor may by paying lessee the reasonable value of casing and other equipment necessary to leaving and maintaining said well in good oil and gas field condition, have the use of production from same for his own purposes on said leased lands, but not for commercial sale on or off said lands; likewise, as to any substantial producing water well, land reservoirs for storing waters, drilled, built, repaired and maintained by lessee who also shall have right of use on or off said lands without charge; D. That in event lessor has occasion to charge that lessee or assigns may not be carrying out his or its obligations under intent of terms of lease and amendments thereof timely and in good faith for any reason lessor shall notify lessee in writing specifying the alleged breach and lessee shall have the full period of 45 days from and after date of service of such notice within which to remedy the existing breach, if the same be of

such nature that it can be remedied within said period of time, and otherwise to commence action reasonably required and prosecute the same with diligence until such breach is fully cured; failing in which, and at the expiration of said 45 days, following service of such notice, in writing lease shall terminate at the option of the lessor; E. That it is understood and agreed that the commencement of operations for development of oil, and/or gas production upon said lands by lessee or assigns within the term of said lease and amendments thereof shall operate to extend same and lessee's rights, privileges and interest as hereunder for and during such period of time as lessee or assigns shall prosecute such operations with reasonable diligence after the term expiration thereof, and in the event oil and/or gas in commercial quantities be discovered as a result thereof, this lease shall thereupon be and thereafter remain as fully in force and effect as though such discovery had been accomplished within the term hereof as herebefore stated; F. That it is agreed and understood that lessee shall be obligated to and have exclusive right to handle and sell all of the natural gas and/or oil produced, saved and not used for fuel in operation upon the lands covered hereby, and domestic purposes on said lands as provided in the lease, including royalty oil and gas; shall pay the royalty owner or owners in cash exchange, monthly, the reasonable market value of all royalty gas or oil produced and marketed during the next preceding calendar month, which at no time shall be fixed at any price or value proportionately less than lessee may receive for his/its share for crude oil or crude natural gas marketed from said lands, or proportionately less than the field price if any. In witness whereof we sign this the 24th day of June, 1941.''

The record also shows that on the same day, that is June 24, 1941, there was issued to John G. Fey a check drawn on the First National Bank & Trust Company, Helena, Montana, dated June 24, 1941, and payable to the order of John G. Fey, in the sum of $4,053. This check was signed by the A. A. Oil Corporation, Helena, Montana, L. C. Stevenson, President, and countersigned

by E. O. Stevenson, Assistant Secretary-Treasurer. This check was endorsed payable to the order of Fiscal Agent, the A. A. Oil Company or Corporation and signed by John G. Fey. On the same day, that is June 24, 1941, John G. Fey of Gold Butte, Montana, made application and subscribed for 4,053 shares of stock in the A. A. Oil Corporation, which certificate of shares in said amount was issued by the A. A. Oil Corporation to John G. Fey by L. C. Stevenson, President, E. O. Stevenson, Assistant Secretary-Treasurer, on the 14th day of September, 1941. This certificate for the 4,053 shares of said stock was assigned on November 1, 1941, by John G. Fey to L. C. Stevenson of Helena, Montana.

It is defendants' contention that the three amendments to the original lease became the lease and are to be considered together under R. C. M. 1947, section 13-708. See Lyon v. Dailey Copper M. & S. Co., 46 Mont. 108, 120, 126 Pac. 931.

The record shows that thereafter the defendant A. A. Oil Corporation and associates moved an oil and gas drilling rig and other materials onto the above described Fey land, established a camp, and started actual drilling of a well known as Fey No. 1 on September 21, 1941, and finished drilling July 31, 1942. The well was drilled to a depth of 1,550 feet. At the trial it was testified to and it is conceded by all parties that the gas flow as measured was between one million and one million five hundred thousand cubic feet per 24 hours, on an open flow basis, with rock pressure which varied from 215 pounds per square inch when well shut in and 173 pounds per square inch on test. The well has been capped and shut in since completed and no gas has been marketed therefrom.

The defendants then moved their rig to the other side of the structure on the lands owned by the Purcells and there started another well, which was lost, and another gas well, Purcell No. 2, was completed thereafter as a producing gas well. Thereafter the defendant, L. C. Stevenson, returned to the Fey leases and he and Mr. Fey decided on the location of another well on the Fey properties. However, when Stevenson checked the legal

description of this location he found it was on other lands belonging to John Fey's son. He then attempted to have John Fey accompany him in locating a well site for the second Fey well, but Mr. Fey did not go with him and Stevenson spotted a location. Stevenson then wrote to John Fey, explaining to Fey that he, Stevenson, had attempted to contact Fey in regard to the location of the second well, but had been unable to do so. That Stevenson had finally obtained casing and would be moving onto the Fey lands to do more drilling. Mr. John Fey did not testify that he did not receive this letter.

Stevenson had engaged a company to furnish equipment and transport the same with housing and other material at considerable expense, with which to establish a camp for drilling the second well on the Fey lands, and when they arrived at the gate leading into the Fey lands they were met by Mr. John Fey who forbade them entering upon his lands. Mr. Fey testified on redirect as to this matter as follows:

"Q. On October 23rd when you talked with Mr. Stevenson at the time those building were brought up? A. Yes.

"Q. Did he make any statement there then as to where he intended to drill? Did he make any statement then? A. No. No. He wanted to locate a camp, naturally.

"Q. Well, I am only asking what he said. A. Well, he never told me anything about wanting to drill. It was October 23rd, and with the equipment that he had at that time, why he couldn't have done much drilling. The 23rd of October and winter was practically on and these buildings needed a lot of repair to be livable."

On recross-examination John Fey testified:

"Q. At that time did he tell you that he was moving, or was going to move the buildings on your land to establish a camp for a drilling program on the land? A. I don't know. He wanted to bring the buildings in there. He never told me anything about it. He just wanted to bring the buildings on there. Never said anything about drilling, never had anything to drill with.

"Q. What did he tell you that he wanted to bring the buildings there for? A. I suppose to establish a camp.

"Q. And that would be incident to drilling wells? A. In our conversation we never got to that because I stopped him.

"Q. You didn't give him a chance to tell you what he was moving the buildings on for, is that right? A. I think it is.

"Q. In other words, before he got to tell you what he wanted to do with the buildings then you told him to keep off the land, is that true? A. Yes, that is true."

After Stevenson was prohibited from going upon the Fey property to continue drilling operations, he proceeded to the Purcell lease and drilled the Purcell No. 1-A and the Ida Murray No. 1 well, both of which are gas producers, then drilled the Murray-Johnson No. 1 well to a depth of 2,447 feet. This well is a non-producer. At the time of trial he was down 2,500 feet on the Gordon Christian No. 1 well.

On or about December 7, 1946, E. J. McCabe wrote Mr. John Fey, Gold Butte, Montana, informing him that the lessees under the lease had requested him to write in reference to the interference by the lessors in preventing the lessees from entering on the lands, stating that by such interference, "you have further delayed the present owners from exercising their rights under the said oil and gas lease." The letter also requested that the writer be notified whether or not the said letter set forth substantially a true statement of the facts of the refusal of the owners to allow lessees to enter upon the lands for further developments, and to please notify the writer whether or not lessees will be prevented entrance on said lands to drill for gas and oil. The letter ended by stating: "That it is the sincere hope of the present owners of said oil and gas lease that there has been a mistake as it is their desire to fully comply with all requirements of said oil and gas lease and that the attempts in the future by their representatives to enter upon your lands for the purpose of drilling oil and gas wells thereon will not be interfered with or prevented by you or your authorized agents or employees." No reply was received to this letter.

The record shows that shortly after Stevenson determined to drill the structure, and up to the time of trial, he had contacted the officers of the different pipe line companies operating in the area, among them being E. B. Coolidge of the Treasure State Pipe Line Co., the Northwest Natural Gas Co., and the Montana-Dakota Utilities Co. They all refused to build in at that time, as the material for building a pipe line, especially piping, was allocated and unobtainable except in certain cases; labor was scarce and hard to obtain. As soon as conditions changed they "would be glad to talk business."

On or about May 8, 1948, plaintiffs served defendants with "Notice of Breach of Lease," setting forth therein a full description of all the lands described in plaintiffs' complaint herein. Said breach of the terms of said lease, as amended, consists of the following:

1. Failure of the lessee, his successors and assigns to drill an exploratory well to the usual oil producing stratum in the area where the land covered by said lease is situated;

2. The failure of the lessee, his successors and assigns to drill additional wells after the completion of the alleged well No. 1 in the SW¼ SW¼ of Section 22, Township 37 North, Range 2 East;

3. Failure of the lessee, his successors and assigns to diligently and properly operate the alleged well No. 1, and failure of the said lessee, his successors and assigns to produce any oil or gas from said well;

4. Failure to market any oil or gas from said well;

5. Failure to pay or tender to the lessors or to the lessors' credit the delay rentals specified in said lease for the privilege of deferring further drilling.

June 15, 1948, a letter by E. J. McCabe was written to Mr. John G. Fey, Gold Butte, Montana, and the same letter to Mrs. Rosa J. Fey, Gold Butte, Montana, in which each was informed that: "It is the claim of lessees that the oil and gas lease mentioned and described in said 'Notice of Breach of Lease' has been fully performed in all particulars and respects

to date, and that all requisites to date to be performed by the lessees under said lease have been fully performed." The letter recites again that on or about September 17, 1946, Mr. Stevenson on behalf of his principals, "wrote you a letter, calling your attention to the fact that he had theretofore been to your place for the purpose of obtaining your help in exact location of a gas well, that he missed you each time, that he had been able to buy casing and had other casing on order from National Supply Company; that he would try to see you at an early date to fix exact location for well. That Stevenson had notified you several times of his intention to move additional buildings and equipment onto the leased lands to carry out a well drilling program thereon; that you stopped them at the gate onto his property. You notified him not to attempt entering any part of your lands."

The letter continues: "The persons I represent desire to be informed whether it is your intention to continue to prevent them from entering upon the lands in the future for the purpose of continuing on their part the performance of the terms and provisions of aforesaid oil and gas lease. I shall appreciate if you will have your attorney notify me of what your intention is in this respect.

"It has been and now is the earnest desire of my clients at all times to fully comply with the terms of said oil and gas lease."

These letters were sent by registered mail; no answer was received thereto.

On or about August 4, 1948, a "Notice of Forfeiture and Demand for Release" signed John G. Fey by Louis P. Donovan, his attorney, and Rosa J. Fey by Louis P. Donovan, her attorney, to the defendants was received by them, in which notice the lands affected are set forth and described as in the plaintiffs' complaint herein, it is declared that John Fey, also known as John G. Fey, and Rosa J. Fey, his wife, are the owners of the land described and that they "have declared and hereby do declare forfeited and terminated that certain oil and gas lease made and given by John G. Fey and Rosa J. Fey, his wife, as

lessors, to John Reynolds, as lessee, dated the 4th day of April, 1940, and the alleged amendments thereof being dated June 24, 1941. Said oil and gas lease being of record in the office of the County Clerk and Recorder of Toole County, Montana, in Book 18 of Oil and Gas Leases, at page 453 thereof, and the amendment or alleged amendment to said lease is recorded in the office of the County Clerk and Recorder of Toole County, Montana, in Book 18 of Oil and Gas Leases, at page 455 thereof.'' The notice then demanded of defendants that they release of record the said oil and gas lease and surrender possession of the leased premises to John G. Fey and Rosa J. Fey, and then set forth the grounds of forfeiture.

September 7, 1948, plaintiffs filed their quiet title action against defendants.

Finally on October 17, 1950, a contract was signed by the A. A. Oil Corporation as vendor and the Montana-Dakota Utilities Company as party of the second part, whereby the utilities company agreed to build into and take all commercial gas produced by the A. A. Oil Corporation on the lands herein described, which contract was filed by defendants as a part of the record for a rehearing with the affidavit of L. C. Stevenson, President of the A. A. Oil Corporation, in which affidavit he states that as of August 1951, the said utility has now built its pipe line into the structure and is purchasing the available gas from the A. A. Oil Corporation in accordance with its contract, and has paid the A. A. Oil Corporation and the landowners, upon whose lands natural gas producing wells are located, and that the only producing gas well controlled by the A. A. Oil Corporation, under oil and gas leases from which no gas was taken by said utility company is the Fey No. 1 well, and the utility company is ready, willing and able to extend its pipe line to and purchase natural gas from said Fey No. 1 well, and from other natural gas wells which may be drilled by the said A. A. Oil Corporation, or its successors or assigns, upon the lands of the plaintiffs described in their complaint; that the A. A. Oil Corporation has at all times been ready and willing

and able to drill to completion additional wells for the production of natural gas and oil upon the plaintiffs' lands in accordance with the terms of the oil and gas lease and amendments and modification thereto.

Plaintiffs contend that defendant should have marketed the gas from the Fey No. 1 well; that defendants should have drilled further wells and that defendants should have drilled to deeper depths and tested for oil, and that defendants not having fulfilled the foregoing implied covenants of the lease, the lease should be forfeited or cancelled.

While it is true that oil and gas leases in cases of ambiguity or uncertainty are generally construed in favor of the lessor and against the lessee and that it is the policy of the law to favor the forfeiture of oil and gas leases in order to prevent lands being burdened by profitless and unworked leases, see Abell v. Bishop, 86 Mont. 478, 284 Pac. 525; McNamar Realty Co. v. Sunburst Oil & Gas Co., 76 Mont. 332, 247 Pac. 166; Bowes v. Republic Oil Co., 78 Mont. 134, 252 Pac. 800, still "One who seeks to enforce a forfeiture must himself be free from blame." 37 C. J. S., Forfeitures, section 5 a. page 11. The rule is clear that the lessor who intends to claim forfeiture, where development is an element, has the duty to demand that development proceed or commence. 58 C. J. S., Mines and Minerals, section 205, page 502; Storm v. Barbara Oil Co., 177 Kan. 589, 282 Pac. (2d) 417; Spikes v. Weller, 159 Kan. 597, 156 Pac. (2d) 540. There is no written notice of lack of development nor any notice to proceed therewith in this record until the notice of breach of lease of May 8, 1948. Yet on May 8, 1948, nor at any other time subsequent to October 23, 1946, nor at any other time has plaintiff or either of them ever notified defendants or either of them that defendants would be permitted to enter upon plaintiffs lands to continue drilling for oil or gas, or at all. Neither of plaintiffs have at any time notified defendants or either of them that plaintiffs had rescinded the order of October 23, 1946, given to defendants by plaintiffs "to keep off their land." Mr. John Fey's testimony at the

trial is self-explanatory on that point. See Williston on Contracts, section 1334, page 3748; Restatement of the Law of Contracts, section 320, page 482.

The record is replete with the efforts of defendants to get an explanation from plaintiffs as to why plaintiffs refused permission to defendants to go upon their lands to continue drilling and other operations of the lease and whether plaintiffs would permit defendants to do so; that defendants continually endeavored to obtain oil and gas drilling equipment and to interest a pipe line company to build into the structure and buy the gas. The plaintiffs may not complain that defendant A. A. Oil Corporation did not drill more wells when plaintiffs refused to allow defendants entrance to their lands to drill more wells. "No one can take advantage of his own wrong." R. C. M. 1947, section 49-109. Where a lessee, as in this case, was ready, able and willing to drill further wells and develop the lessor's property, an attack upon the lessee's title by lessors will relieve the lessee of the duty either to proceed with the drilling operations or the payment of the delay rentals specified during the contest of his title. See Twyford v. Whitchurch, 10 Cir., 132 F. (2d) 819, and cases cited. Compare Hudson v. Lyons, 199 Okl. 348, 186 Pac. (2d) 309, which is a case of somewhat similar facts, where lessors interfered with lessees moving equipment upon the leased premises. The court held: Where lessors of oil and gas lands have brought suit against the lessee for cancellation of the lease, they are not in a position to complain of the inactivity of the lessee during pendency of such suit. Steven v. Potlatch Oil & Refining Co., 80 Mont. 239, 257, 260 Pac. 119; Brooks v. Arkansas-Louisiana Pipe Line Co., 8 Cir., 77 F. (2d) 965, 970; Elsey v. Wagner, 199 Okl. 449, 183 Pac. (2d) 829; Hudspeth v. Schmelzer, 182 Okl. 416, 77 Pac. (2d) 1123; Spikes v. Weller, 159 Kan. 597, 156 Pac. (2d) 540. Lessor's repudiation if not withdrawn is a continuing legal excuse for lessee's refusal to perform. Williston on Contracts, section 1334, page 3748; Restatement of the Law of Contracts, section 320, page 482; Merrill, Covenants Implied in Oil and

Gas Leases, (2d) Ed., section 70, page 177; Alphonzo E. Bell Corp. v. Listle, 74 Cal. App. (2d) 638, 169 Pac. (2d) 462.

Here the application of the equitable maxim should be applied, that he who comes into equity must come with clean hands, and the concept that he who seeks redress for the violation of such a contract resting upon mutual and dependent covenants must himself have performed his part of its obligations.

The lessee did not expressly agree in the lease to build a pipe line to market the gas, and no authority has been found under the facts in this case and the terms of this lease wherein an implied covenant has been held or enforced. Summers, Oil & Gas, Perm. Ed., Vol. 2, section 415, page 382, states: "But whether this duty to market be expressed in general terms or implied, the performance thereof must be tested by what amounts to reasonable diligence under all the facts and circumstances of the particular situation. In some of the decisions it is said that the diligence of the lessee is to be measured by what a reasonably prudent operator would have done under the circumstances, having in mind his own interest as well as that of the lessor."

The very nature of this wildcat field and the cost of piping the gas to the nearest point of delivery for sale, rendered such a project prohibitive, even if the necessary piping and labor could have been obtained.

Courts of equity are not bound by cast-iron rules. The rules by which they are goverened are flexible and adapt themselves to the exigencies of the particular case. Relief will be granted when, in view of all the circumstances, to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition. See Parchen v. Chessman, 49 Mont. 326, 142 Pac. 631, 146 Pac. 469.

There is no element of fraud in this case. Courts must interpret contracts as made by the parties, not make new ones for them, no matter how unreasonable the terms may ap-

pear after they have been consummated; merely because the plaintiffs may have reason to regret their bargain, or that they can now make a better bargain, affords them no ground to avoid the obligation assumed. See McConnell v. Blackley, 66 Mont. 510, 515, 214 Pac. 64.

It is conceded that the defendants brought in a gas well ▆ [13, 14] able of producing gas in marketable quantities and, as plaintiff John Fey testified, was a producing gas well. To say that they shall be declared in default and shall forfeit their lease if they do not market the product, when there is at the time no profitable market, would be contrary to equitable principles and to any express terms of the lease. It would amount to saying, the defendants have drilled a producing well which furnishes gas in marketable quantities, but as there is no market the well is not producing. The contract is not reasonably susceptible to any such intrepretation. "The lessors will not be heard to complain of their own folly, if folly it was, in granting such a lease." Steven v. Potlatch Oil & Ref. Co., supra [80 Mont. 239, 260 Pac. 123].

The plaintiffs may not in equity insist upon the performance ▆ ▆ of the terms of the lease and at the same time prevent the performance thereof. One who prevents the performance of the terms of a contract cannot avail himself of the non-performance which he himself prevents. See Smith v. Gunniss, 115 Mont. 362, 144 Pac. (2d) 186; 12 Am. Jur., Contracts, section 329, page 885; Stevens v. Potlatch Oil & Ref. Co., supra; Merrill, Covenants Implied in Oil & Gas Leases, Effect of Prevention by Lessor, section 21, page 67.

Whether due diligence has been exercised depends upon the ▆ facts and circumstances of each case. The question here is whether or not the lessees under the facts and circumstances exercised due diligence to operate the lease. Keeping in mind that this was a wholly wildcat field, war conditions prevailing with all casing and materials under government control, with labor almost impossible to obtain, the lessors had much to gain at no cost and little to lose in granting the lease. The lessees

were entering upon an uncertain, expensive and speculative venture, which might result in heavy loss. All of the land of the lessors had to be explored, hence the five-year term and as long thereafter as gas or oil or either of them was produced. Yet a gas well was completed of about 1,500,000 cubic feet per 24 hours of production within the time; other wells were drilled on the structure to obtain sufficient gas to attract a pipe line and market, all at considerable expense of over $100,000 to the lessees, and strenuous efforts were being made at all times to obtain enough gas on the structure and the group of leases held by lessees.

The positive testimony of Mr. Stevenson was not controverted that from the time he started development of this wildcat structure until the trial he had talked with officials of the Treasure State Pipe Line Co., Mr. E. B. Coolidge, the Northwest Natural Gas Co., the Montana Power Co., and the Montana-Dakota Utilities Co. Mr. E. J. McCabe testified of his different trips to Minneapolis to contact and interest the Montana-Dakota Utilities Co. and others in building a pipe line to the structure and lands defendants had under lease. All this negotiation finally culminated in the signing of a contract, dated October 17, 1950, by the Montana-Dakota Utilities Co. with the A. A. Oil Corporation, above referred to. The record is replete with the efforts of defendants to procure a pipe line company that would take the gas at a profit to lessors and lessees. When at last a market was obtained for the gas, the lessees only find that the plaintiffs have attempted to withdraw their lands. This does not square with the equitable principles involved.

The paramount duty of the court is to ascertain the intent of ▉▉▉ the parties *at the time the contract was entered into* and to give effect thereto consistent with legal and equitable principles.

The acts of the parties showing that each has by acquiescence or otherwise placed the same construction and understanding thereon, should be given weight, as they at the time or times are assumed to know best the terms and tenor of the contract.

The record here shows that with the discovery of gas on other lands of the structure and the block of leases of lessees showing a sufficient volume, a contract was signed with a pipe line company, all of which was beneficial to the plaintiffs. The lessees under their lease were not bound to produce both oil and gas; they were required to produce either oil or gas; this they did by bringing in a producing gas well in time. The record does not show that the defendants ever refused to drill a test well for oil to the oil horizon in that field, but the record does show reasonable diligence by defendants to test the structure for gas, which has been done. The test for oil was not permitted by plaintiffs.

While there was considerable delay in the completion of Fey No. 1 well, and in the subsequent unsuccessful attempt to drill the second well on the Fey lands by the Feys' refusal to allow defendants entrance to drill, the further circumstances of the inability of defendants to obtain materials for the drilling were not controverted. During those war years all operators were restricted by the government's strict allocation of iron and steel products. The lessees proceeded to develop the properties under all the circumstances with reasonable diligence and in accordance with what a reasonably prudent operator would have done.

In considering an appeal in an equity case, this court has the ▮▮ duty under R. C. M. 1947, section 93-216, of reviewing the evidence and of determining if such justifies the findings, conclusions and judgment of the trial court and under the facts and circumstances of a particular case to determine where the equities and the preponderance of the evidence lie. That is particularly true here where there is little if any conflict in the evidence. This being an equity case, and no cause appearing why a new trial or the taking of further evidence should be ordered, it is our duty to finally determine the same. Compare Rooney v. Ford, 127 Mont. 92, 256 Pac. (2d) 1090, and cases therein cited; Prewitt v. Prewitt, 127 Mont. 407, 265 Pac. (2d) 198.

The amendment and modification of June 24, 1941, provided that: "Receipt is hereby acknowledged from the A. A. Oil Corporation for itself and John Reynolds, of lease rentals and considerations accrued and to accrue to and including July 1, 1942, on that certain oil and gas lease dated fourth day of April A. D. 1940, given by John G. Fey and Rosa J. Fey, lessors of Gold Butte, Montana to John Reynolds lessee of Great Falls, Montana * * * and in further consideration of said payment made and of development and services to be done by lessee and assigns, I (we) stipulate the following amendments and provisions in said lease: * * *

"(a) That the term of said lease shall be increased or extended to five years from and after July 1st, A. D., 1941, subject to compliance with its original and herein amended conditions." See full text of agreement above.

Since defendants brought in a producing commercial gas well within the time provided, Steven v. Potlatch Oil & Ref. Co., supra, the lease was validated in its entirety and was valid on the date this action was instituted.

The evidence supports the lower court's findings that at all ▮▮▮ time in the complaint mentioned the plaintiff John Fey was the owner in fee simple of the real property described in paragraph IV of plaintiffs' complaint; and the plaintiff Rosa J. Fey was at all times mentioned the owner in fee simple of the tracts of land described in paragraph V of plaintiffs' complaint herein; and the plaintiffs, John Fey and Rosa J. Fey, were at all of said times the owners in fee simple, as tenants in common, of the lands described in paragraph VI of plaintiffs' complaint herein, subject however, to the rights of the defendants under the terms of that certain oil and gas lease, a copy of which is attached to the answer of defendants, the A. A. Oil Corporation and L. C. Stevenson, Sweet Grass Arch Apex Syndicate, and the finding that the said oil and gas lease, dated April 4, 1940, was still valid and in force and effect as to the southwest quarter of the southwest quarter of section twenty-

two, township thirty-seven north, range two east, M.P.M., in Toole County, Montana.

The evidence preponderates against the court's finding that the said oil and gas lease of April 4, 1940 should be forfeited, cancelled and annulled as to all of the lands of the plaintiffs except the last above described forty acres, and the finding and conclusion that defendants have no right, title or interest in the plaintiffs' lands, other than said forty acres.

The court made no finding and apparently did not take into ██ ██ consideration the written amendments and modifications of said lease of April 4, 1940, which were executed on the 14th day of April 1941, and on June 24, 1941. The first two of these instruments or amendments were executed by John G. Fey and Rosa J. Fey, the third amendment of June 24, 1941, was signed by John G. Fey, and in her reply to defendants' answer the plaintiff Rosa J. Fey admitted the execution of this third amendment of June 24, 1941, and thereby adopted and ratified it as her act. This was no longer a controverted question in the case. The rule is that parties are bound by and estopped to controvert admissions in their pleadings. Compare Weatherman v. Reid, 62 Mont. 522, 524, 525, 205 Pac. 251; Frank v. Symons, 35 Mont. 56, 63, 64, 88 Pac. 561.

We conclude that the said lease made, executed and delivered by John Fey and Rosa J. Fey, dated April 4, 1940, and the. amendments thereof dated April 14, 1941, and June 24, 1941, covering 9,265 acres of land in Toole County, Montana, being particularly described in plaintiffs' complaint filed herein is now and has been since the 7th day of September 1948, a valid, subsisting and enforceable lease; that defendants be put into possession of said premises under the terms of said lease and amendments; that the period of time from the 7th day of September 1948, being the date of the filing of the complaint herein, until the final determination of this cause, shall not be counted against defendants in determining their rights under the said lease and the amendments thereof.

For the reasons stated the findings of the trial court which are in conflict with this opinion are ordered vacated. The judgment is reversed and the cause remanded with directions to enter judgment herein in favor of defendants in conformity with the views herewith expressed.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICES ANGSTMAN and ANDERSON, concur.

MR. JUSTICE DAVIS, not participating.